Ex parte CHOW CHOK et al.

(Circuit Court, N. D. New York. May 11, 1908.)

1. EVIDENCE—CONCLUSIONS.

Testimony that inspectors, on apprehending Chinese persons who attempted to enter the United States unlawfully, "took charge of them," was objectionable as the statement of a conclusion.

2. ALIENS—CHINESE EXCLUSION—WHAT CONSTITUTES "ENTRY" OR "ENTRANCE."

An "entry" or "entrance" of a Chinese person into the United States, within the Chinese exclusion acts, means more than the mere act or crossing the border, and consists in his going at large or becoming domiciled in the country.

3. HABEAS CORPUS—EVIDENCE—ADMISSIBILITY.

On a hearing of writs of habeas corpus to procure the release of Chinese persons apprehended while attempting to unlawfully enter the United States, testimony of an officer as to what he would have done had they attempted to escape was inadmissible.

4. ALIENS—CHINESE EXCLUSION—DEPARTMENTAL RULES—EFFECT.

Rules of the Department of Commerce and Labor respecting the exclusion of Chinese persons have the force and effect of law when not inconsistent with it or with the Constitution or the treaty with China.

5. SAME.

Chinese persons were not "found unlawfully in the United States," so as to entitle them to a hearing as to their right to remain, where, when they crossed the border into the United States at a point remote from the designated port of entry, they were within sight of inspectors, who, intending to prevent their unlawful entry, followed them closely until they had proceeded about one-fourth of a mile across the border, and until it was apparent that they intended to enter unlawfully, and, taking them into custody, conducted them immediately to the nearest port of entry for investigation of their right to enter; the term "found unlawfully in the United States" referring to those Chinese persons who have entered, gone at large, and mixed with and become a part of the population. Hence such persons having been given opportunity to show their right to enter, and having remained mute, the inspector in charge had jurisdiction to exclude them.

Habeas Corpus. Hearing on eight writs allowed by Hon. A. C. Coxe, and made returnable at Syracuse term of this court, April 7, 1908, held by Judge Ray.

R. M. Moore, for petitioners.

Geo. B. Curtiss, U. S. Atty., H. E. Owen, Asst. U. S. Atty., and Alford W. Cooley, Special U. S. Atty.

RAY, District Judge. These eight Chinese persons, now detained at the Malone, N. Y., detention house, by the Chinese inspector in charge, for the purpose of returning them to China, they having been refused permission to enter the United States after full opportunity to be heard and show their right, if any, on the ground they are alien Chinese persons, not belonging to any class having the right to enter, claim that they are illegally held and detained.

The circumstances are somewhat peculiar, and R. M. Moore, an attorney at law, swears out these writs in behalf of these persons, alleging that their detention is unlawful, in that when apprehended

they had already entered the United States, and were found therein, and were not seeking admission, and that, conceding that they were then unlawfully in the United States and had no right to remain therein, the Chinese inspector in charge, H. R. Sisson, had no jurisdiction or power to hold them in custody and deport them or return them to China or pass on their cases; that they were found in the United States and in no sense have applied for admission into the United States; that they are not seeking to enter, but to remain unmolested; that for these reasons they are entitled to a hearing on the question of their right to be and remain in the United States before a United States commissioner or judge in the regular way with the usual right of appeal in such cases. On the return of the writs, the said persons by their attorney applied for the taking of more testimony so as to fully present the facts. The cases were therefore sent back to the inspector by order of the court, and ample opportunity given to present the cases fully. The matters are now submitted on the returns and such additional testimony.

The facts are not intricate. The government officers, having such matters in charge, learned that these eight persons were on a train approaching the United States, and it was supposed or assumed that their purpose was to illegally enter the United States. Inspectors West and Landis, March 20, 1908, were in the train running from Montreal to Locolle, a small town in Canada near the border, and which train carried these persons. At Locolle the eight Chinese persons got off the train, as did West and Landis. Soon thereafter two teams with carriages and drivers came and took these Chinese persons and went off in the direction of the border between Canada and the United States in the vicinity of Rouse's Point, which is a village in New York about one mile from the line. Inspectors Dunton and Yale had proceeded to the border from Rouse's Point in anticipation of the arrival of these Chinese persons and of their attempt or purpose to enter the United States in an irregular way and, as was believed, unlawfully.

When near the line, the teams referred to halted, and the Chinese alighted and moved towards the border. The inspectors, or some of them, kept them in sight, and, as the Chinese crossed the border, passing from the highway to the railroad track, and thence along it as they crossed, they were closely followed by Inspectors West and Landis, who had been joined by Inspectors Yale and Dunton, who had been waiting at a farm house on the Canada side. All these officers were there for the purpose of preventing the illegal entrance of these persons into the United States, for the purpose of apprehending them if they did enter, and sending them back to China if on due examination found not entitled to enter. The purpose was to prevent their "entrance" into the United States, within the intent and meaning of the Chinese exclusion acts. Nothing was said to them as they crossed the border into the United States, nor until they had proceeded something like a fourth of a mile along the track after crossing the border. Then Inspector Dunton gave them to understand they would have to go along with the inspectors. From

that point into Rouse's Point, the nearest railroad station for taking the train to Malone, the nearest port of entry, these petitioners were accompanied by Inspectors West, Dunton, and Landis, who took possession of and carried most of their baggage. These inspectors were acting under the orders of their superior. I sustain the objection to the statements that the inspectors "took charge of them" as a conclusion. Their purpose in being there, and what was said and done, are acts which speak for themselves. It is evident the officers took them actually into their custody and under their control for the purpose of preventing their actual and completed entry into the United States as "entry" or "entrance" should be construed; that is, to prevent their going at large or becoming domiciled in the United States. It is evident the purpose was to take them from the place where they crossed the border by all necessary force, to Malone, the designated point for the admission of Chinese persons into the United States, for due investigation of the facts bearing on their right to enter into the United States. I sustain the objection to the testimony of the officer as to what he would have done if these persons had attempted to get away.

From Rouse's Point these eight persons were taken direct and immediately to the Malone Detention House, and before the inspector in charge, where each was given full opportunity to make such voluntary statements as he might desire to make relative to his right to enter the United States and duly informed that he might produce any evidence that he had, or might be able to produce, touching his right to enter the United States, each having indicated his desire to enter, and as to his right to counsel and to be heard. In short, the authority and powers of the inspector, the purpose of the proceedings, and the rights of these persons were fully explained to them, severally, and each remained mute. Each refused to answer all questions touching his right to enter the United States, or to furnish the name of any witness or witnesses by whom he might be able to prove such right. Neither of them produced any paper or writing or evidence of any kind showing, or tending to show, a right on his part or on the part of either of said persons to enter or to be in the United States or claimed to have any such document. Landis, Dunton, and West were sworn on the hearing before Inspector Sisson as to the identity, etc., of said persons with those who came across the border and were apprehended as aforesaid, and as to the transaction and the circumstances of their apprehension. Inspector Sisson then closed the cases, each being a separate proceeding and had as such, and decided that each of said persons was an alien Chinese person not entitled to enter the United States, and gave to each a notice, form 429, "Notice to rejected Chinese applicant," and each of such persons was informed of its nature and effect, and was also informed of his right to appeal from such decision to the Secretary of the Department of Commerce and Labor. Instead of taking appeals, these persons, by their attorney, swore out these several writs.

It is perfectly evident that each of these eight persons sought to enter the United States. It is evident that their purpose to enter was

discovered by the United States, and that it was on the ground, by its proper officers, to prevent their illegal entry. Their purpose was not fully developed until they had actually crossed the border, as they sent no messenger or notice in advance announcing their desire to enter; but that they did desire to enter is plain. So soon as they had entered on United States territory and showed their purpose to remain, these inspectors took possession of a part of their baggage, mingled with and accompanied them, and gave them to understand they were subject to their directions. When such Chinese persons undertook to follow the railroad at a point where it branched away from Rouse's Point, the officers told them to come with them, and they did. In short, from the moment when they crossed the border, they were in the actual, though not formal, custody of the inspectors. All the proceedings from the moment these persons crossed the border, and even before, to the time Inspector Sisson made his decision, were taken and had for the purpose of preventing the illegal or unlawful entry of these persons into the United States, and for the purpose of determining their right to enter, if any, in the legal and formal mode prescribed by the laws of the United States and the rules of the Department, which have the force and effect of law when not inconsistent with it, or with the Constitution, or treaty with China. They were actually found in the very act of entering, and, so soon as it was fully developed that such was their purpose, they were virtually taken in charge. It cannot logically be said that they are Chinese persons found unlawfully in the United States, whose deportation is sought. Logically, they are Chinese persons seeking to enter the United States, and who have shown no right to enter, although given ample opportunity so to do.

Jurisdiction to prevent unlawful entry into the United States is vested in these inspectors, representing the Department of Commerce and Labor. Jurisdiction to deport alien Chinese persons "found unlawfully in the United States" and held to be illegally therein is vested in United States commissioners and the District Court. These petitioners were not "found" unlawfully in the United States, but were found before they reached the border line and at the border line, and the proceedings to prevent their entrance into the United States, if found not entitled to enter, were instituted and prosecuted diligently from the moment it became certain they intended to enter. They were not "permitted to enter," or allowed to enter, within the meaning and intent of the law. "Enter" means more than the mere act of crossing the border line. Those who seek to enter in the sense of the law, and those the policy of the law seeks to prevent from entering, are those who come to stay permanently, or for a period of time, or to go at large and at will within the United States. These persons, on entering, were at once surrounded by officers, silently taken in charge, in effect arrested, and from that time effectually deprived of their liberty and prevented from going at large within the United States. They had no more actually entered the United States than has a Chinese person who escapes from a detention house while awaiting a determination of his right to enter, and were no more "found unlawfully in the United States" within the true intent and meaning of the Chinese exclusion acts than would be a Chinese person, who,.

on being actually arrested and physically seized on the exact boundary line, should escape and succeed in running the distance of a mile into the United States and concealing himself for a day or week before being rearrested. Literally, such a person would be found unlawfully in the United States, but not in the sense of the statute, and, I apprehend, no one would seriously contend the inspector had lost jurisdiction of the case. No such narrow construction is to be put upon the acts of Congress and the rules and regulations of the Department of Commerce and Labor.

Section 12 of the act of July 5, 1884 (chapter 220, 23 Stat. 117 [U. S. Comp. St. 1901, p. 1310]), provides that:

"No Chinese person shall be permitted to enter the United States by land without producing to the proper officer of customs the certificate in this act required of Chinese persons seeking to land from a vessel."

Also:

"And any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came," etc..

By the same section, and also in section 13 of the act of September 13, 1888 (chapter 1015, 25 Stat. 476 [U. S. Comp. St. 1901, p. 1317]), it is provided (section 13) "that any Chinese person or person of Chinese descent found unlawfully in the United States" may be arrested on a warrant issued "by any justice, judge, or commissioner of any United States court," etc. See, also, Act May 5, 1892, c. 60, § 4, 27 Stat. 25 (U. S. Comp. St. 1901, p. 1320), as to Chinese persons convicted and adjudged under any of said laws "to be not unlawfully entitled to be or remain in the United States," and their removal. Section 32 of the act of March 3, 1903 (chapter 1012, 32 Stat. 1221), provides for rules as to the entry and inspection of aliens along the borders of Canada and Mexico; Act Feb. 14, 1903, c. 552, § 7, 32 Stat. 828 (U. S. Comp. St. Supp. 1907, p. 90), transfers jurisdiction as to the exclusion of Chinese and others to the Department of Commerce and Labor, and then we have rules which it is unnecessary to recite or refer to. Rule 4, approved July 27, 1903, provides that:

"No Chinese person other than a Chinese diplomatic or consular officer and attendants, shall be permitted to enter the United States except at the ports of * * * Malone, N. Y."

Rule 2 provides:

"Only those Chinese persons who are expressly declared by the laws and treaty relating to the exclusion of Chinese to be admissible shall be allowed to enter the United States, and those only upon compliance with the requirements of said laws and treaty and of regulations issued thereunder."

Having in view the law, the treaty, the rules, the duty of the inspectors, the fact that these Chinese were seeking to cross into the United States along a railroad track at a point remote from the designated port of entry, and the purpose of these officers in being at such point, and what occurred, it is impossible to hold that either of these eight Chinese persons was "found unlawfully in the United States." It was a proceeding on the part of the proper and duly authorized officials of the Executive Department of the United States to exclude

these Chinese persons from entry; to prevent their entrance into the United States, their going at large, or becoming domiciled therein. The same question, in effect, was raised in Nishimura Ekiu v. United States, 142 U. S. 651, 661, 12 Sup. Ct. 336, 339, 35 L. Ed. 1146, where Nishimura, pending the determination of her right to enter the United States, was taken from the vessel and landed on United States soil and confined in a mission house. On this point the court said:

"Putting her in the mission house, as a more suitable place than the steamship, pending the decision of the question of her right to land, and keeping her there, by agreement between her attorney and the attorney for the United States, until final judgment upon the writ of habeas corpus, left her in the same position, so far as regarded her right to land in the United States, as if she never had been removed from the steamship."

In the Japanese Immigrant Case, 189 U. S. 86, 87, 99, 23 Sup. Ct. 611, 613, 614, 47 L. Ed. 721, the petitioner actually landed and had been at large four days when she was apprehended by the immigrant inspector by order of the Secretary of the Treasury and ordered sent out of the country as a person not entitled to enter, and who had "surreptitiously, clandestinely, unlawfully and without any authority come into the United States." On habeas corpus, the Supreme Court, affirming the lower court in dismissing the writ, said:

"It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the Legislature and executive branches of the national government. As to such persons the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law. * * * Now, it has been settled that the power to exclude or expel aliens belonged to the political department of the government, and that the order of an executive officer, invested with the power to determine finally the facts upon which an alien's right to enter this country, or remain in it, depended, was 'due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to re-examine the evidence on which he acted, or to controvert its sufficiency.' Fong Yue Ting v. United States, 149 U. S. 698, 713, 13 Sup. Ct. 1016, 37 L. Ed. 905; Nishimura Ekiu v. United States, 142 U. S. 651, 659, 12 Sup. Ct. 336, 35 L. Ed. 1146; Lem Moon Sing v. United States, 158 U. S. 538, 547, 15 Sup. Ct. 967, 39 L. Ed. 1082. * * * Therefore it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States. No such arbitrary power can exist where the principles involved in due process of law are recognized."

In United States v. Ju Toy, 198 U. S., at page 263, 25 Sup. Ct., at page 646, 49 L. Ed. 1040, the court said:

"The petitioner, although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction and kept there while his right to enter was under debate."

I think it clear that "found unlawfully in the United States" refers to those Chinese persons who have entered the United States, gone at

large, mixed with and become a part of our population, and not to those who, arriving at the border, and suspected of having an intention to enter unlawfully, are followed by the officers having authority to exclude them and actually taken into custody and immediately conducted to the nearest port of entry for investigation of their right to enter, so soon as it is developed that it is their purpose to enter unlawfully and go at large in defiance of law. Entertaining, as I do, these views, and not stopping to discuss the proposition that in no event can a writ properly issue in such a case as this until the remedy by appeal to the Department of Commerce and Labor has been exhausted, which I think true (United States v Sing Tuck, 194 U. S. 161, 168, 24 Sup. Ct. 621, 48 L. Ed. 917), I hold that Inspector Sisson had jurisdiction; that full opportunity was given each of the petitioners to present his case and show his right, if any, to enter the United States; and that his order was lawful and proper.

The writs are dismissed, and the persons remanded.