# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

                v.

MIGUEL LOMBERA-VALDOVINOS,
            *Defendant-Appellant.*

No. 04-50390

D.C. No.
CR-03-03275-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
June 8, 2005—Pasadena, California

Filed November 30, 2005

Before: Betty B. Fletcher, Pamela A. Rymer and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Rymer

15517

## COUNSEL

Timothy A. Scott, San Diego, California, for the defendant-appellant.

Ileana M. Ciobana, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

## OPINION

FISHER, Circuit Judge:

Defendant-appellant Miguel Lombera-Valdovinos ("defendant") principally appeals the district court's denial of his motion for acquittal after a jury returned a guilty verdict for attempted illegal reentry.[1] We have jurisdiction under 28 U.S.C. § 1291.

---

[1]The defendant, who has been deported several times, also appeals the district court's admission of evidence of his prior convictions for illegal reentry. Because we reverse his conviction on other grounds, we do not reach the defendant's other claims.

We consider the question of whether it is possible to convict a previously deported alien for attempted illegal reentry into the United States under 8 U.S.C. § 1326 when he crosses the border with the intent only to be imprisoned. We conclude that it is not, because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint. The government, operating under a misconception about the meaning of official restraint, failed to introduce evidence to support a finding of such intent, so we must reverse.

## I. Background

At trial, Border Patrol agent Guillermo Avila testified to the following facts. On October 29, 2003, Avila was patrolling the U.S.-Mexican border. He sat in a marked border patrol vehicle between the "primary fence," marking the actual U.S./Mexican border, and the "secondary fence," located about 100 feet north of the primary fence. With binoculars, Avila saw the defendant and four or five others standing on the Mexico side of the border, about 200 yards away from Avila. Avila then looked away for about 15 seconds; when he turned back, he saw the defendant, alone and now on the U.S. side of the primary fence, walking directly toward him. When the defendant continued to walk toward Avila, Avila drove toward him. When they met, the defendant stated, "I want to see an immigration judge," admitted to being a citizen of Mexico and, when asked if he had any legal basis for being present in the United States, answered, "No." He also said that he "wished to go back to jail." Avila arrested and searched the defendant. The defendant has been deported several times on previous occasions.

## II. Discussion

"We review de novo the district court's denial of a Rule 29 motion for judgment of acquittal. This standard requires us to 'review the evidence presented against the defendant in the

light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Ruiz-Lopez*, 234 F.3d 445, 447-48 (9th Cir. 2000) (quoting *United States v. Sarkisian*, 197 F.3d 966, 984 (9th Cir. 1999)).

## A. Attempted Illegal Reentry

[1] A previously deported alien who "enters, attempts to enter, or is at any time found in, the United States" without the express consent of the Attorney General has violated 8 U.S.C. § 1326(a)(2). However, for the purposes of § 1326, "enter" has a narrower meaning than its colloquial usage. An alien has not entered the United States under § 1326 unless he does so "free from official restraint." *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1191 n.3 (9th Cir. 2000) (en banc) (citing *United States v. Pacheco-Medina*, 212 F.3d 1162, 1166 (9th Cir. 2000)); *see also United States v. Hernandez-Herrera*, 273 F.3d 1213, 1218 (9th Cir. 2001) ("Since 1908, federal courts have recognized that 'entering' the United States requires more than physical presence within the country. . . . To 'enter,' an alien must cross the United States border free from official restraint." (citing *Pacheco-Medina*, 212 F.3d at 1166)); *United States v. Parga-Rosas*, 238 F.3d 1209, 1213 (9th Cir. 2001) (discussing the "legal fiction that entry is not accomplished until a person is free from official restraint").

[2] Attempted illegal reentry requires proof of specific intent, *Gracidas-Ulibarry*, 231 F.3d at 1190, more particularly the specific intent "to reenter without consent." *United States v. Leos-Maldonado*, 302 F.3d 1061, 1063 (9th Cir. 2002). Because an alien has not "reentered" unless he has done so free from official restraint, the requirement of specific intent for this attempt crime means that to be found guilty, a defendant must have the specific intent to reenter "free from official restraint."

**B. Official Restraint**

At trial, the government did not attempt to prove that the defendant intended to be free of official restraint, but instead argued that "official restraint" could only be restraint by officials of the Department of Homeland Security ("DHS"). Thus, if the defendant had the specific intent to be taken to jail, he satisfied the statute's requirement of having the intent to be free from official restraint. The district court agreed, and instructed the jury, "An alien enters or reenters the United States when they [sic] actually cross the border and are free to go about, that is, go at large or at will within the United States. If the alien is restrained by the agents or barriers *of the Department of Homeland Security* at the border, they [sic] are not yet free to go about or at large within the United States." (emphasis added).

**[3]** On appeal, all parties now agree that contrary to the jury instructions and repeated statements of the court and prosecution, official restraint — a legal concept that is "interpreted broadly" in our circuit, *Hernandez-Herrera*, 273 F.3d at 1219 (citing *Ruiz-Lopez*, 234 F.3d at 448) — encompasses restraint by any government official, not just officials of DHS. *See, e.g.*, *United States v. Oscar*, 496 F.2d 492, 493 (9th Cir. 1974) (holding that official restraint encompasses restraint by customs officials); *cf. United States v. Zavala-Mendez*, 411 F.3d 1116, 1120 n. 19 (9th Cir. 2005) ("Many people would rather be arrested and put in a warm jail than leave the safety of 'official restraint' . . . ."). Our circuit precedent clearly holds that an alien who is on United States soil, but who is "deprived of [his] liberty and prevented from going at large within the United States," remains under official restraint and therefore has not entered the country for the purposes of § 1326. *Hernandez-Herrera*, 273 F.3d at 1218 (quoting *Pacheco-Medina*, 212 F.3d at 1163-64 (quoting *Ex parte Chow Chok*, 161 F. 627, 628-29 (N.D.N.Y. 1908), *aff'd* 163 F. 1021 (2d Cir. 1908))); *see also id.* at 1219 (stating that aliens who "lack[ ] the freedom *to go at large and mix with*

*the population*" remain under official restraint) (quoting *Ruiz-Lopez*, 234 F.3d at 448) (emphasis added).

This understanding of the legal status of certain aliens in our country stretches back many decades. In *Kaplan v. Tod*, 267 U.S. 228, 229 (1925), an alien thirteen-year-old was brought to Ellis Island, and then "handed over to the Hebrew Sheltering and Immigrant Aid Society," which allowed her to live with her father. Writing for the Court, Justice Holmes concluded that "[w]hen her prison bounds were enlarged by committing her to the custody of the Hebrew Society, the nature of her stay within the territory was not changed. She was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.* at 229-30.[2]

**[4]** With this proper understanding of the scope of official restraint in mind, it is clear that an alien who is under official restraint from the moment of crossing, and who never intended to avoid or change that status, cannot therefore have the necessary intent to be guilty of attempted illegal reentry. This precisely describes the defendant's actions and intent here — as the prosecution itself argued to the jury, but on the faulty premise that intent to go to jail was intent to be free of official restraint.

---

[2]The dissent proposes a much narrower interpretation of "official restraint," based on practical and policy considerations. However, we are required to apply our circuit's rule that if an alien is "deprived of [his] liberty and prevented from going at large within the United States," he is not free from official restraint. *Hernandez-Herrera*, 273 F.3d at 1218 (citations omitted). For the purposes of determining *intent*, the defendant here was in much the same situation as the orphan in *Kaplan* — he sought to have his "prison bounds . . . enlarged" beyond Agent Avila's custody to the custody of some other United States jailer. *Kaplan*, 267 U.S. at 230. Surely the dissent does not impute to the defendant a grasp of its theory of how the doctrine of official restraint operates.

## C. The Evidence Requires Reversal

**[5]** Under the correct view of the law, the evidence adduced at trial was insufficient to support the defendant's conviction. The evidence is uncontroverted that agent Avila saw the defendant before he crossed into United States territory, and that when the defendant crossed the border, he walked straight to Avila and told him that he wanted to go to jail. *See Ruiz-Lopez*, 234 F.3d at 448 ("[W]e construe restraint broadly to include constant government surveillance of an alien . . . .").

There is no evidence to support the government's post-hoc theorizing that the defendant actually intended to sneak into the country, and changed his plans only when he was spotted by Avila. These facts are thus distinguishable from those in *Leos-Maldonado*, where we concluded that the evidence supported a finding of specific intent to reenter in part because of the defendant's efforts to avoid detection. *See* 302 F.3d at 1064 ("The evidence shows that [the defendant] scaled the international border wall, crouching down to avoid detection after landing on American soil."). Here, the evidence establishes that the defendant made no effort to evade official restraint. Indeed, he *sought* such restraint. The jury's verdict was premised on a faulty understanding of the governing statute.[3]

### III. Conclusion

**[6]** Because no rational trier of fact could conclude, on the evidence presented here, that the defendant was guilty of the specific intent crime of attempted illegal reentry, we reverse

---

[3]As for the dissent's practical concern that our holding creates a new loophole for § 1326 violators, this case presents a rare set of factual circumstances where there is no evidence of anything other than the intent to be taken into custody. Given these facts and its misapprehension of the governing law, the government made no effort to dispute that the defendant's intent was to be taken into custody and to remain in custody.

the defendant's conviction and remand to the district court to enter a judgment of acquittal. *See Ruiz-Lopez*, 234 F.3d at 448-49.

**REVERSED and REMANDED.**

---

RYMER, Circuit Judge, dissenting:

The question here is not whether Lombera-Valdovinos committed the crime of illegal "reentry" or "being found in" the United States, which cannot be established unless the alien was free of "official restraint" between the time of his crossing the border and the time of his arrest. *See, e.g.*, *United States v. Pacheco-Medina*, 212 F.3d 1162, 1166 (9th Cir. 2000) (holding that an alien who is never free from official restraint does not commit the crime of being found in the United States). Rather, the question is whether he had the specific intent, that is, the purpose or conscious desire, to "reenter" the United States. *See United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc) (holding that attempted reentry in violation of 8 U.S.C. § 1326 is a specific intent crime). Lombera-Valdovinos posits that his only purpose in trying to enter the country was to go to jail. Thus, in his view, he could not have intended to "reenter" the country free of official restraint.

I dissent because Lombera-Valdovinos's theory — that he could not have had the specific intent to "enter" the United States because his only purpose was to go to jail — is based on a flawed syllogism. It goes like this: An alien who cannot legally reenter the United States crosses the border and when spotted at the border by a border patrol agent, tells the agent that he wants to see an immigration judge to go to jail. An alien who is stopped at the border, or is continuously under surveillance from the time he crosses the border until he is apprehended, is under "official restraint" and thus, is deemed

not to have "entered" the country. Therefore, an alien who wants to go to jail lacks the specific intent to "reenter" the country because his intent is to be restrained by government authorities.

The flaw is that "jail" is not the same thing as "official restraint." Jail no doubt is a place where one is restrained, officially. And to want to go to jail is to want to be restrained officially. But "official restraint" is not just any old restraint, officially imposed: it is a term of art for border control. The doctrine of "official restraint" determines whether an alien who illegally crosses the border and is physically within the United States is nevertheless deemed not to have made an "entry." It flows from the immigration fiction that an alien who is caught at the border never "enters" the United States and so is excludable instead of deportable. *See, e.g.*, *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953) (treating excluded alien held at Ellis Island as if stopped at the border). The "official restraint" doctrine is "premised on the theory that the alien is in the government's constructive custody at the time of physical entry. By contrast, where an alien is able to exercise his free will subsequent to physical entry, he is not under official restraint." *United States v. Aguilar*, 883 F.2d 662, 683 (9th Cir. 1989); *see Pacheco-Medina*, 212 F.3d at 1164-65 (summarizing cases).

Lombera-Valdovinos was arrested within a hundred yards and a few minutes of crossing the border. He told the border patrol agent that he wanted to go to jail. This manifests an intent to be free of "official restraint" *at* the border, and to be restrained *inside* a jail *beyond* the border. For whatever reason, Lombera-Valdovinos's avowed purpose for coming to the United States was to go to jail. This presupposes he would be part of the United States population, albeit that part of the population which is incarcerated. Prisons or jail facilities house persons in this country who are convicted of crime in this country; they are not an arm of the border-control process

that "restrains" aliens before they actually go at large within the United States.

Perhaps because he recognizes this is so, Lombera-Valdovinos argues that, as the Bureau of Prisons and the Attorney General are government actors, and because the government is the entity that imposes "official restraint" at the border, by extension, his wish to be put in jail is a wish to be kept in "official restraint." In this context, he argues that the instructions inaccurately narrowed "official restraint" to the Department of Homeland Security (DHS). I disagree. The instructions did state that "[i]f the alien is restrained by the agents or barriers of the Department of Homeland Security at the border, they are not yet free to go about or at large within the United States." However, the focus on DHS is immaterial, because there was no dispute that Lombera-Valdovinos was apprehended by the Border Patrol — that is, by DHS. While the government agrees that other agencies of the government could restrain an alien at the border (for example, park police or the DEA), it is an irrelevant possibility in this case. What Lombera-Valdovinos wants license to argue is that if an alien is restrained by DHS at the border and intends to be restrained *by any government agency thereafter*, his purpose is always to be in "official restraint." This is just another (circular) way of saying that his purpose of going to jail was the purpose of being subject to "official restraint" because the Bureau of Prisons and the Attorney General — who run the prison system — are government actors, and government actors are the ones who subject returning aliens to "official restraint" at the border. But neither the Bureau of Prisons nor the Attorney General commits an alien (whether or not under "official restraint"), or anyone else, to the custody of the Bureau of Prisons; only a United States District Judge can do that, after indictment, trial, and conviction.

Thus, contrary to how the majority sees it, the government did not fall short of the mark by not attempting "to prove that the defendant intended to be free of official restraint, but

instead arguing "that 'official restraint' could only be restraint by officials of the Department of Homeland Security." Op. at 15522. As DHS was the only agency involved in Lombera-Valdovinos's apprehension, it would have been confusing and misleading to assert or instruct otherwise. There is no basis in the evidence for supposing that official restraint could be imposed in this case by any agency except DHS. Nor is there any basis for concluding, as the majority then does, that "if the defendant had the specific intent to be taken to jail, he satisfied the statute's requirement of having the intent to be free from official restraint." *Id.* To want to go to jail *inside* the borders of this country *is* to intend to be free of official restraint — in this case, DHS — *at* the border.

*Kaplan v. Tod*, 267 U.S. 228 (1925), upon which the majority relies, suggests nothing different. In *Kaplan*, the alien was a child who was inadmissible and was ordered to be excluded. The order could not be carried out because of war. Meanwhile, the child was ordered to be kept at Ellis Island, then was turned over to the Hebrew Sheltering and Immigrant Aid Society, which allowed her to live with her father. She had been stopped at the border and was under the "official restraint" of the immigration authorities at Ellis Island, "[w]hen her prison bounds were enlarged by committing her to the custody of the Hebrew Society." *Id.* at 230. As the Court explained, "[t]heoretically she is in custody at the limit of the jurisdiction awaiting the order of the authorities." *Id.* at 231. The Court's use of the words "prison bounds" was a figurative description of the child's continuing constructive custody until such time as her deportation order could be executed. By contrast, Lombera-Valdovinos's articulated purpose was to go to a real jail, not to stay in the constructive custody of immigration officials at the border or its functional equivalent.

As the district court pointed out, Lombera-Valdovinos had many avenues to achieve this purpose. He could have crossed the border without being seen, then turned himself in to a law

enforcement official or committed a crime that would inevitably have led to incarceration. Instead, he got caught in the act of trying to enter the United States without permission and, having achieved what he said he wanted — to go to jail — now seeks to gut the crime of attempted reentry by a play on words.

As the district court also stated: "I think there comes a point in time that stretching the concept of entry and intent to enter results in absurd results. And if it's going to be stretched to be an absurd result, it won't be by me." Me either.

None of the remaining issues raised on appeal requires reversal, so I would affirm across the board.