*1162 BYBEE, Circuit Judge,
concurring in the judgment and dissenting as to everything else:
I agree with the majority that the specific-intent standard that governs Argue-ta-Rosales’s case is supplied by United States v. Lombera-Valdovinos, 429 F.3d 927, 928-30 (9th Cir.2005). Because'the district court failed to apply that standard, and because we are bound by Lomberar-Valdovinos, I concur in the majority’s judgment vacating the conviction and remanding this case for retrial. Maj. Op. at 1158.
In all other respects, however, I dissent. I am convinced that Lomberar-Valdovinos was wrongly decided and that our understanding of when an alien is “free from official restraint” has reached an absurd position. Under Lomberar-Valdovinos, an alien , is not guilty, of attempted illegal reentry even if he crosses into the United States surreptitiously and outside a port of entry, so long as he tells border control that he came in hopes of remaining under restraint by any government official — even in a federal prison far from the border— once in the United States. Judge Rymer rightly pointed out in dissent from Lomb-era-Valdovinos that this novel and unduly expansive definition of “official. restraint” makes no. sense and creates a puzzling loophole in the law of attempted illegal reentry. See Lombera-Valdovinos, 429 F.3d at 931-33 (Rymer, J., dissenting). The passage of time has done nothing to blunt the force of her critique. It is time we revisited Lombera-Valdovinos.
I
I begin by tracing the history that led up to Lombera-Valdovinos, because it was á case in which “what’s past [was] prologue.” William Shakespeare, The Tempest act 2, sc. 1. Over roughly the last 100 years, the term “entry” has taken ‘on a “narrower meaning, than its colloquial usage” in the context of immigration law. Lombera-Valdovinos, 429 F.3d at 928. For purposes of 8 U.S.C. §§ 1325-26, an alien is considered not to have effected an “entry” into the United States unless he not only “cross[es] the ... border,” but does so “free from official restraint.” United States v. Hernandez-Herrera, 273 F.3d 1213, 1218 (9th Cir.2001). The provenance of the official restraint doctrine— and the future of the doctrine, as evidenced by Lomberar-Valdovinos and this case — should make us rethink the concept of. what it means to enter the United States.'
A
Courts adopted this peculiar definition of “entry” — freedom from official restraint — because, for many years, immigration law drew a distinction between exclusion and deportation. Excluded aliens were those who were summarily sent home at the border, in contrast to aliens who were afforded the more elaborate process of deportation because they were “already physically in the United States.” Landon v. Plasencia, 459 U.S. 21, 25, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982). See Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (“The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.”). The distinction' was a- crucial one. By virtue of their presence in the United States, aliens in deportation proceedings had greater procedural and substantive rights than aliens in exclusion proceedings — an administrative hearing and an appeal, the right to designate the country of deportation; and the right to seek voluntary departure. Landon, 459 U.S. at 26, 103 S.Ct. 321. By contrast, an excludable alien is a determi *1163 nation at the, border, “usually ... at the port of entry.”. Landon, 459 U.S. at 25, 103 S.Ct. 321. As the Court explained in Zadvydas, “certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders. But once ■ an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all ‘persons’ within the United States, including aliens.” 533 U.S. at 693, 121 S.Ct. 2491. See generally David A. Martin, Graduated Application of Constitutional Protections for Aliens: The Real Meaning of Zadvydas v. Davis, 2001 Sup. Ct. Rev. 47, 92-100.
The distinction between excludable and deportable aliens required courts to confront a largely metaphysical, but tricky immigration law problem: What was to be done about aliens who physically crossed the United States border but never reached the point of being able to move freely within the country and mix with the general population? The paradigm example for this is an alien who presents himself at a port of entry and is taken to a “secondary inspection” area, technically across the international border, for further investigation into whether he is authorized to enter the United States. Was the alien now entitled to a deportation proceeding because border agents walked him a few feet across the border? The courts, responded to this conceptual ambiguity about which due process rights apply in the immigration context by developing the “legal fiction that entry is not accomplished until a person is free from official restraint.” United States v. Parga-Rosas, 238 F.3d 1209, 1213 (9th Cir.2001). Under this legal fiction, an alien who never made it out of a- port of entry, who was held temporarily by the United States, or who crossed the border at some other place but was never outside the control of the border authorities, would be deemed not to have entered the United States despite having done so in a literal sense. See, e.g., Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (“[W]hile she was at Ellis Island she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared.”); United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644 (1905) (holding that an alien detained at a port of entry, “although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate”).
Although it was relatively easy to determine whether an alien entered the United States when he presented himself for inspection at a port of entry, it was more complicated to determine if an alien had entered the United States when he was interdicted inside the United States, but near the border." The case generally credited with inaugurating the official restraint doctrine in this area is a Chinese exclusion case, Ex Parte Chow Chok, 161 F. 627 (N.D.N.Y.), aff'd, 163 F. 1021 (2d Cir.1908). See Lombera-Valdovinos, 429 F.3d at 929; United States v. Pacheco-Medina, 212 F.3d 1162, 1163-64 (9th Cir.2000). In that case U.S. inspectors had' tracked eight Chinese aliens as they crossed from Canada into the United States. The aliens were “kept ... in sight,” stopped a quarter of a mile inside the United States, and taken into custody. Chow Chok, 161 F. at 628. The aliens filed for a writ of habeas corpus, contending that, because they had successfully entered the United States, they could only be deported, not excluded. The court found, however, that the aliens had not successfully entered the United States because “from the moment when they crossed the border, they were in the actual, though not formal, custody of the inspectors.” Id. at 630. Accordingly, they *1164 were only entitled to administrative processing and could be excluded.
B
Although the “entry fiction” doctrine began life as a means of excluding aliens at or near the border without affording them deportation proceedings, it soon crossed over into th¿ realm of criminal law. Courts began to interpret the term “enter,” in criminal statutes, as a term of art whose meaning roughly corresponded to the contours of the entry fiction doctrine in immigration law.
For example, in United States v. Vasilatos, 209 F.2d 195 (3d Cir.1954), a Greek searpan who had previously been deported from the United States falsely represented to an immigration officer at the Port of Philadelphia that he had never been deported and thereby gained temporary admission to the United States. Id. at 196-97. The seaman stayed on his ship until it called at Baltimore, where he disembarked and headed inland. When he was apprehended in New York a year later, he was charged with illegal reentry. Id. at 197. The government alleged that the seaman had “entered” the United States at Phila: delphia, making that city the proper venue for his trial; the seaman argued that hi$ entry had occurred at Baltimore and that Baltimore was thus the proper venue. Id.
The then-prevailing illegal reentry statute (8 U.S.C. § 180 (1946)) did not define what constituted an “entry” into the United States, and there was no general definition of the term elsewhere in Title 8, so the Third Circuit — understandably— looked to the “official restraint” cases for guidance as .to when an entry occurred. The court observed that “administration of the immigration laws has long proceeded on th[e official-restraint] theory of entry” and saw “no reason to disturb” that theory in the context of the' criminal law. Vasilatos, 209 F.2d at 197. It therefore held that the seaman had “entered” the United States at Philadelphia, where his fraudulently obtained clearance for temporary admission had first given him freedom from official restraint, rather than at Baltimore, where he had physically landed in the country. Id.
After the relevant events in Vasilatos occurred, but before the Third Circuit issued its decision, Congress enacted the Immigration and Nationality Act of 1952, which collected and reorganized the various provisions of American immigration law in one place: Title 8. The Act’s definitional provision defined the term “entry” very broadly as “any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise.” 8 U.S.C. § 1101(a)(13) (1952). But despite the facial breadth of this definition, the courts were unwilling to do away with the traditional requirement of freedom from official restraint. Rather, they simply assumed without much explanation that § 1101(a)(13) had incorporated the preexisting judicial doctrine of official restraint. See, e.g., In re Dubbiosi, 191 F.Supp. 65, 66 (E.D.Va.1961) (acknowledging the adoption of 8 U.S.C. § 1101(a)(13) but stating that “[w]e do not believe, however, that this definition removes the requirement of establishing not only'physical presence, but also freedom from official restraint, before ‘entry* is accomplished”).
At our first opportunity, in United States v. Oscar, 496 F.2d 492 (9th Cir.1974), we adopted the same view of what constitutes an “entry” for criminal purposes. Oscar and an accomplice arranged for two Honduran nationals to be driven to the San Ysidro Point of Entry, where the Hondurans lied to customs officials and said they were United States citizens. The Hondurans were taken to secondary *1165 inspection and later arrested. Id. at 492-93. Oscar was subsequently convicted under 18 Ü.S.C. § 2 of aiding and abetting an illegal entry into the United States.
We reversed the conviction, holding that Oscar could not be guilty of aiding and abetting because the two Hondurans had not committed the underlying offense of illegal entry under 8 U.S.C. § 1325. We acknowledged that the two had come into the United States “[i]n a physical sense” when they moved to secondary inspection, which ostensibly was enough to satisfy the broad definition of “entry” in the 1952 Act. Oscar, 496 F.2d at 493. But we agreed with Vasilatos ’s' and Dubbiosi’s holdings that “entry,” for immigration-related purposes, requires freedom from official restraint. Id. at' 493-94. We reasoned that although Vasilatos and Dubbiosi were not factually analogous to Oscar’s case, it made sense for us to adopt their approach to “entry” because Congress had chosen to define “entry” in § 1101(a)(13), and it was “unlikely that Congress would define a term in § 1101 ... if it intended the term to have different meanings” in different contexts. Id. at 493-94.[1] That consideration, along with the rule of lenity, led us to conclude that the Hondurans had not “entered” the United States because they had not left the Port of Entry and thus never escaped, “official restraint.” Id. at 494.
In subsequent . cases interpreting 8 U.S.C. § 1326, the illegal-reentry statute, we adopted the same view of “entry” that Oscar applied under § 1325, holding that an illegal reentry required both physical entry into the country and freedom from official restraint.[2] For example, in United States v. Martin-Plascencia, 532 F.2d 1316 (9th Cir.1976), the defendant was charged with unlawful entry. He had gone near the port of entry at San Ysidro and crawled through a hole in one chain link fence and under a second. He was caught 50 yards into the United States. We rejected his argument that he was under official restraint because he had not “reach[ed] the streets of San Ysidro”:
while nominally within the confines of the Port of Entry, [defendant] was at ho instant up until the moment of his arrest under any type of official restraint, but to the contrary was exercising his free will, youthful enterprise, and physical agility in evading fixed barriers in accomplishing his entry.
Id. at 1317. See also United States v. Aguilar, 883 F.2d 662 (9th Cir.1989).
.0
We substantially broadened our understanding of the official restraint doctrine in United States v. Pacheco-Medina, 212 F.3d 1162 (9th Cir.2000). Pache'co was climbing the international. fence between the United States and Mexico when he was picked up by a surveillance camera. The monitor signaled a Border Patrol agent on a bicycle, and he arrived just as Pacheco dropped off the fence, “crouched in preparation for escape in the country at large.” Id. at 1163. Pacheco ran, but was quickly *1166 apprehended. We overturned his conviction for unlawful-entry because, although he “tried to get into the country” and, in fact, had succeeded in getting on U.S. soil without permission, “he was under official restraint the whole time.” Id. at 1165.. Of course, Pacheco was, not under “official restraint” the “whole time,” at least not in the sense in which immigration law created the doctrine to , distinguish between de-portable and excludable aliens.
,It is worth pausing here to, consider how far our conception of “official restraint” had strayed from the meaning developed in immigration law up until Pacheco-Medina. Recall that the “official restraint” distinction developed to explain'why we gave different due' process rights to aliens who obtained access to the United States (lawfully or unlawfully) than aliens who presented themselves for admission and, technically — but only technically and temporarily-found themselves standing on U.S. soil. Pacheco-Medina said that mere surveillance (even mechanical sur-veillanee) by U.S. authorities was the same “official restraint” as aliens experience when they present themselves at a port of entry.[3]
Pacheco-Medina quickly led to some very strange “how-many-angels-are-dancing-on-the-head-of-a-pin” inquiries. Consider two cases decided shortly after Pacheco-Medina, In Herhandez-Herrera, Herrera was part of a group of aliens who scaled the international fence. The “still watch” agent had the group under observation, and they were quickly detained by field agents. Herrera, however, escaped the agents and ran into thick brush where, unfortunately.for him, he.“was free from *1167 official restraint because he was no. longer visible to the ‘still watch’ agent.,,. [The field agent] followed Herrera’s footprints, and not Herrera.” 273 F.3d at 1219., We affirmed Herrera’s conviction' for illegal reentry. By contrast, in Gonzalez-Torres, Border patrol agent Watkins, using binoculars, observed Torres and others enter the United States. Watkins radioed to a Second agent, who began pursuit. Although Watkins actually “lost sight of the group ‘for a number of seconds,’” we found that this gap in the surveillance was not sufficient to break the officer’s “continuous observation.” 309 F.3d at 599. We overturned Torres’s conviction. The fact that two aliens who commit identical acts and have identical mental states are treated differently based on whether or not a border patrol agent managed to watch them the whole time should give us pause.
As a theoretical matter, moreover, it is far from clear that the concept of official restraint maps onto criminal law particularly well. Official restraint, after all, was designed to answer the question whether an alien in custody could be excluded or must be deported, whether he was to be afforded minimal procedural rights or plenary rights. See Chow Chok, 161 F. at 628. We must, of course, determine what “entry” means ‘ in convictions under §§ 1325-26. But our concern has nothing to do with what process the alien is due. Once an alien has been indicted under either of these sections, the scope of his procedural rights is decided: he is entitled to a trial by jury, see U.S. Constamend. VI; representation by counsel, id.; and the sundry other procedural protections that define our criminal justice system, id. amend. V. “Official restraint” thus ends up being used to answer an entirely different question in. criminal cases — i.e., when, the actus reus of illegal entry or reentry has been accomplished — and, like any repur-posed concept, produces some odd results. For example, the notion that an alien who hops a border fence and makes it a substantial. distance into this country has not committed the act of entering the United States because he was under constant surveillance defies common sense. Perhaps this is why neither § 1325 nor § 1326 nor § 1101(a)(13) mentions any such requirement.
The majority provides little reason for adopting ‘ the concept of entry which" was developed to discern between different due process standards in the immigration context, in the very different context of determining when someone has committed the substantive crime of illegal reentry. It first warns that the crime of reentry, without the official restraint limitation, would unfairly “make crimináis" out of persons who, for any number of innocent reasons, approach immigration officials at the border.” Maj. Op. at 1160. I respectfully disagree that this is a problem.[4] The lawful process to enter the U.S. does not include walking across the border without permission. ‘ That is, by definition, an illegal — or unauthorized — entry. Whether or not that person happens to be under surveillance at the time does nothing to change her culpábility.
The majority’ also suggests that we should continue to apply the official restraint doctrine in the criminal context because “the doctrine has been around for decades.” Maj. Op. at 1159. But the fact that this doctrine was adopted long ago— *1168 without any serious thought either at its inception or since — is precisely what should give us pause.
D
There is one final development I must mention. Prior to Lomberar-Valdovinos, an alien who could not be charged with illegal' entry or reentry because he was never free from official restraint could still be charged with attempted illegal entry or reentry. See United States v. Leos-Maldonado, 302 F.3d 1061, 1063, 1065 (9th Cir.2002) (holding that an alien can ■ be guilty of attempted entry even if he is under official restraint throughout his crossing of the U.S. border). We held in United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1195-96 (9th Cir.2000) (an banc), that attempted illegal reentry is a specific-intent crime.[5] At the same time we construed the requisite intent broadly, concluding that an alien need only have the “conscious desire[] to reenter the United States without the express consent of the Attorney General.” Id. at 1196; see also id. at 1198 (“§ 1326 requires a finding that the defendant consciously desired to reenter the United States without consent.”). Under this standard, an alien who intentionally crossed the border but did not escape official restraint would usually be guilty of attempted illegal entry or reentry, assuming he could not claim one of the general criminal-law defenses to specific intent. See, e.g., United States v. Smith-Baltiher, 424 F.3d 913, 925 (9th Cir.2005) (holding that a § 1326 defendant was entitled to present a mistake-of-fact defense based on his alleged belief that he was a U.S. citizen); United States v. Blanco-Gallegos, 188 F.3d 1072, 1076 (9th Cir.1999) (considering and rejecting a § 1326 defendant’s voluntary-intoxication defense on the merits). - •
H
Against this legal backdrop, we heard Lomberar-Valdovinos. A Border Patrol agent first saw Lombera standing on the Mexico side of the U.S.-Mexico border. The agent looked away for a brief period, and when he turned back, Lombera was now on the U.S. side of the primary fence, walking directly toward the agent. The agent drove toward the defendant, and when they met, Lombera said, “I want to see an immigration judge;” admitted to being a Mexican citizen, and conceded'that he had no legal right to enter the United States. He explained that he had crossed the border because he “wished to go back to jail.” Lombera, who had previously been deported several times, was arrested, charged with attempted illegal reentry, and convicted. of. that offense by a jury. Lombera-Valdovinos, 429 F.3d at 928.
We reversed the conviction, holding that no rational trier of fact could conclude that the defendant had the specific intent necessary to be guilty of attempted illegal reentry. We reasoned that because attempted illegal reentry requires the specific intent to reenter the United States without consent, and because an “entry” into the United States requires freedom from official restraint, a defendant “must have the specific intent to reenter Tree from official restraint’ ” in order to be convicted *1169 of attempted reentry under § 1326. Id. at 929. And then, crucially, we went on to hold that official restraint “encompasses restraint by any government official, not just officials of DHS.” Id. (emphasis added). Thus, the defendant could not be guilty of attempted illegal reentry, because his intention was to go to jail — where he would be subject to “official restraint” by prison officials. Id. at 930.
This reasoning rests on an unprecedentedly expansive view of what constitutes “official restraint.” Until Lombera-Valdo-vinos, the concept of “official restraint”— in both the immigration and the criminal context — had never been used to refer to all forms of confinement by any official of the U.S. government. Rather, it had always been limited to physical restraint or surveillance of an alien by a government officer operating at or just inside the border. See id. at 931 (Rymer, J., dissenting) (“[Official restraint] is a term of art' for border control.”). And for good reason: “Official restraint,” recall, is a legal fiction used to distinguish between aliens who are deemed to have been stopped at the border and those who have reached the interi- or of the United States. This distinction does not turn on what happens to an alien after he gets beyond the border. An alien who ends up incarcerated in a federal prison has reached the interior of the United States no less than an alien who crosses the border undetected and then gads about the country at perfect liberty.
Lombera-Valdovinos’s three explanations for its expansive view of “official restraint” were unconvincing. First, it cited Oscar for the proposition that official restraint is not limited to “officials of DHS,” noting that the official doing the restraining in Oscar was a “customs official[ ].” Id. at 929 (majority opinion). But although the relevant official in Oscar was not,’strictly speaking, a border patrol officer, he was working at the San Ysidro Port of Entry- and clearly functioning as part of the border control system. See Oscar, 496 F.2d at 493. Oscar thus shows, at most, that the notion of official restraint does not depend on where precisely an officer stands on an organizational chart. It does not imply that restraint by any govern-' ment officer, even'one not charged with any duty relating to the border, is “official restraint.”[6]
Second, Lombera-Valdovinos quoted several cases suggesting that any alien who cannot “go[ ] at large within the United States” or “mix with the population” is under official restraint. See Lombera-Valdovinos, 429 F.3d at 929 (emphasis omitted). But these quotations were misleading. In each of these cases, the court being quoted was discussing an alien who was not at liberty because, he was confined by border control. These cases do not establish that whenever an alien is not free to “go at large within the United States,” he is under “official restraint” as that term is used in immigration law. Lombera-Valdovinos ’s failure to appreciate that distinction mákes clear that although our § 1325 and § 1326 cases initially borrowed the concept, of “official restraint” from the immigration context, we have now wrenched it from that context entirely. With each' succeeding step, culminating in Lombera-Valdovinos, we have gotten' fur *1170 ther away from what § 1326 plausibly means. ■
Finally, the Lomberar-Valdovinos majority suggested that an alien who presents himself to the authorities at the border wanting, to go to jail likely perceives no difference between being in the custody of border authorities and being in the custody of “some other United States jailer,” given that he is almost certainly unfamiliar with the. doctrine of “official restraint.” Id. at 930 n. 2. Hence, the majority argued, such an alien cannot possess the intent required for attempted illegal reentry because he does not “intend[] to avoid or change” his status of being subject to official restraint. Id. at 930. But the initial premise of this argument is flawed. An alien who approaches a port of entry and says he wants to go to'jail does not want to stay detained at the border forever; he wishes to go to a prison in the interior and become “part of the United States population, albeit that part of the population which is incarcerated.” Id. at 931 (Rymer, J., dissenting). By asking to go to jail, he demonstrates that he does not perceive the two forms of custody to be the same. See id. at 932-33 (“Lombera-Vaídovinos’s articulated purpose was to go to a real jail, not to stay in the constructive custody of immigration officials at the border or its functional equivalent.”).
In short, none of Lomberar-Valdovinos’s arguments for construing “official restraint” in the way that it did stands up to scrutiny. The case was wrongly decided, and were it not binding on this panel, I would not follow it.
III
Lombera-Valdoviños assumed us that its consequences would be limited, explaining that its holding applied only in the “rare set of factual circumstances where there is no evidence of anything other than the intent to be taken into custody.” Id. at 930 n. 3 (majority opinion).' But I remain concerned about the decision’s potential ramifications, which this case demonstrates may be far-reaching. As the majority opinion here recognizes, nothing in Lomberar-Valdovinos limits that case’s holding to situations in which an alien walks directly up to a border patrol agent and asks straightforwardly to be escorted to jail. Maj. Op. at 1156-57.[7] On the contrary, even an alien who — like Argue-ta-Rosales — acts in ways that strongly suggest his desire to enter the country free from official restraint can assert, if he is apprehended, that he wants to go to jail and thereby claim the protection of Lomb-erar-Valdovinos.
The majority here helpfully tries to address these potential concerns by clarifying that in an attempted illegal reentry case, “[t]he government must prove only that [the defendant] had a specific intent to enter the United States free from official restraint, not that this was his only purpose.” Maj. Op. at 1156-57. It predicts that a defendant who “actually intend[s] to sneak into the country, .and change[s] his plans only when he [i]s spotted” will be convicted of attempted illegal reentry. I certainly hope that the majority is right.. But as the majority reminds us, it is the government’s burden in a § 1326 case to “prove[] unlawful intent beyond a reasonable doubt.” Id. at 1157. *1171 There surely will be some § 1326 cases in which defendants’ dubious claims that they desired to go to jail are nonetheless plausible enough to give the jury reasonable doubt of their guilt, thereby allowing those defendants to “gut the crime of attempted reentry by a play on words.” See Lombera-Valdovinos, 429 F.3d at 933 (Rymer, J., dissenting). This cannot possibly be how § 1326 is meant to work.
Lombera-Valdovinos has left our law stuck in a catch-22 worthy of Joseph Heller: Aliens who cross the border hoping to enter the United States free of restraint must be restrained, while aliens who cross hoping to be restrained by the United States must be freed. Under the majority’s regime, no one gets what he wants, but some people go to jail, while everyone else goes home. This is a strange ¡state of affairs indeed. And we could and should have avoided it by holding in Lombera-Valdovinos that the specific intent required for attempted illegal reentry is the intent to reenter the United States free from restraint by authorities at the border.
The Lombera-Valdovinos panel didn’t choose that course, so I am compelled to concur in the judgment here. But I do so under protest. I would grant Argueta-Rosales his wish and allow him to go to jail.

, See, e.g., United States v. Gonzalez-Torres, 309 F.3d 594, 598-99 (9th Cir.2002); United States v. Hernandez-Herrera, 273 F.3d 1213, 1218-19 (9th Cir.2001); United States v. Castellanos-Garcia, 270 F.3d 773, 775-77 (9th Cir.2001).

. In 1996, Congress refined the INA's concept of lawful entry. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRI-RA) eliminated the definition of "entry” from the INA altogether, replacing it with the term "admission.” See Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. No. 104-208,§ 301(a),nllO Stat. 3009 (1996), codified, at 8 U.S.C. § 1101(a)(13)(A). Undqr the -new definition "admission” was "the lawful entry of the alien into the United ‘ States after inspection and authorization by an immigration officer.” (emphasis added). As we recognized in 2011, “IIRIRA replaced 'entry’ with [the] new concept [of] ‘admission’ ,” and, in so doing, it replaced the dividing line between excludable and deport'able aliens with a new dividing line — one between lawfully admitted aliens and all other aliens, with the latter now subject to "more general ‘removal’ proceedings.” Lezama-Garcia v. Holder, 666 F.3d 518, 527-28 (9th Cir.2011).
Pacheco acknowledged, but rejected out of hand, the changes in definitions in IIRIRA. Although Congress had told us that lawful "admission” required "the, lawful entry of the alien ... after inspection 'and authorization,” 8 U.S.C. §'1101(a)(13)(A) (emphasis added), Pacheco-Medina said that “[j]ust why [the new definition] should matter at all is far from clear,” The fact that IIRIRA eliminated the definition of "entry” — and replaced it with something -very different — somehow "ha[d] no significance here,” Evidently we believed that Congress had no place in defining "entry":. "It certainly does^not change the preexisting, and still existing, judicial concept of what an entry is.” Pacheco, 212 F.3d at 1166 & n. 7.
The majority suggests that Congress’s change does not matter because: (1) the term "entry”, is still used within the definition of "admission,” (2) we reached this issue in Pacheco, and (3) Congress retained the use of the term "entry” in other statutory sections. Maj. Op. at 1159 n. 5. But this misses the point. The majority urges that the official restraint doctrine should be adhered to because it "has been around for decades” and Congress has never "called-into question ... the firmly established judicial gloss on ‘entry.’ ” Id. at 1159. But is not that exactly what Congress has done? Congre.ss decided to eliminate that term of art from the face of the statutory section and replace it with something else. For my present purposes, I do not have to determine what effect IIRIRA might have had on the official'restraint doctrine. But, at the least, the question of what changes, if any, IIRIRA worked on the official restraint doctrine deserved more discussion that it received in Pacheco-Medina.

. One doesn't have to look beyond this case, Lombera-Valdovinos, Gonzalez-Torres, or. Pacheco. to see that these were not “persons who, for any number of innocent reasons, approach immigrant officials.” Whether these persons are scaling the international fence- or running through desert brush, they were not persons seeking to "approach immigration officials” for “innocent reasons.”

. I note that every other circuit to consider the question has disagreed with us, holding that § 1326 does not require specific intent. See United States v. Rodriguez, 416 F.3d 123, 125-26 (2d Cir.2005); United States v. Morales-Palacios, 369 F.3d 442, 446-48 (5th Cir.2004); United States v. Peralt-Reyes, 131 F.3d 956 (11th Cir.1997) (per curiam); United States v. Reyes-Medina, 53 F.3d 327 (1st Cir.1995) (per curiam). As I observe in text, we have given the specific intent requirement a fairly generous reading, which may have effectively narrowed the gap between us.

. Lombera-Valdovinos’s reliance on Oscar as evidence that "official restraint” extends beyond confinement by the Department of Homeland Security is especially curious in light of the fact that since Oscar, the Customs Service has been combined with the Border Patrol into one agency (U.S, Customs and Border Protection), which in turn is under the umbrella of DHS. See 6 U.S.C. § 542 Note. I doubt it ever made sense, in this context, to draw fine-grained distinctions between “customs officials” working at the border and border patrol agents, but it surely does not make sense to do so now.

. And even in those cases I would be concerned. Both the majority in Lombera-Valdo-vinos and the majority in this case ignore the possibility that some aliens in unfortunate circumstances — like Argueta-Rosales — may indeed elect to come into the U.S. with a specific intent to reside in U.S. prisons. Under Lombera-Valdoviños, they may do sd without consequence.