**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

v.

OMAR ARGUETA-ROSALES,
          *Defendant-Appellant.*

</td>
<td>

Nos. 14-50384
     14-50385

D.C. Nos.
3:14-cr-00244-LAB-1
3:10-cr-04572-LAB-1

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, District Judge, Presiding

Argued and Submitted
June 3, 2015—Pasadena, California

Filed April 12, 2016

Before: Raymond C. Fisher and Jay S. Bybee, Circuit
Judges, and Elizabeth E. Foote, District Judge.[*]

Opinion by Judge Fisher;
Partial Concurrence and Partial Dissent by Judge Bybee

---

[*] The Honorable Elizabeth E. Foote, United States District Judge for the
Western District of Louisiana, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated a conviction and sentence for attempted illegal reentry, and vacated the resulting revocation of probation and sentence, in a case in which the defendant presented evidence that he crossed into the United States in a delusional state, believing he was being chased by Mexican gangs, and with the specific intent solely to place himself into the protective custody of United States officials.

The panel held that the district court – which ruled that the mens rea element of attempted illegal reentry under 8 U.S.C. § 1326 requires only that the defendant knew he was crossing into the United States and that he was not privileged to do so – misapplied *United States v. Lombera-Valdovinos*, 429 F.3d 927 (9th Cir. 2005), in which this court held that because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint, it was impossible to convict a previously deported alien for attempted illegal reentry when he crosses the border with the intent only to be imprisoned.

The panel held that the error was not harmless. The panel clarified that where, as here, there is contradictory evidence regarding the defendant's intent, it is for the trier of fact to determine whether the government has proven unlawful intent beyond a reasonable doubt. The panel also clarified that the government need not prove that entry free from

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

official restraint was the defendant's *sole* intent.  The panel concluded that it is not clear beyond a reasonable doubt the district court would have found the defendant guilty absent its misapprehension of the specific intent element.  The panel remanded for proceedings consistent with this opinion.

Judge Bybee concurred in the judgment and dissented as to everything else.  Because the district court failed to apply the standard supplied by *Lombera-Valdovinos*, he concurred in the judgment vacating the conviction and remanding for retrial.  He wrote that he is convinced, however, that *Lombera-Valdovinos* was wrongly decided and that our understanding of when an alien is "free from official restraint" has reached an absurd position.

---

**COUNSEL**

Doug Keller, Federal Defenders of San Diego, Inc., San Diego, California, for Defendant-Appellant.

Laura E. Duffy, United States Attorney, Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, and Francis A. DiGiacco (argued), Assistant United States Attorney, San Diego, California, for Plaintiff-Appellee.

**OPINION**

FISHER, Circuit Judge:

At trial on the charge of attempted illegal reentry into the United States, Omar Argueta-Rosales presented evidence that he crossed into the United States in a delusional state, believing he was being chased by Mexican gangs, and with the specific intent solely to place himself into the protective custody of United States officials. The district court found this evidence plausible, but nonetheless found Argueta guilty of the charged offense, ruling the mens rea element of attempted illegal reentry under 8 U.S.C. § 1326 requires the government to prove only that the defendant knew he was crossing into the United States and that he was not privileged to do so. In *United States v. Lombera-Valdovinos*, 429 F.3d 927, 928 (9th Cir. 2005), however, we held it was "[im]possible to convict a previously deported alien for attempted illegal reentry into the United States under 8 U.S.C. § 1326 when he crosses the border with the intent only to be imprisoned . . . , because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint." Because the district court found Argueta guilty under an erroneous legal standard, we vacate his conviction and remand for a new trial or other proceedings consistent with this opinion.

I

Omar Argueta-Rosales was born in Mexico in 1981. When he was five, his mother migrated to the United States and he was left to the care of his grandparents in Mexico. He lived with his grandparents for four years before reuniting with his mother in Los Angeles, California. He lived with his

mother in Los Angeles until he was 16 years old.    An immigration judge ordered him removed in 2006.

In 2010, Argueta was apprehended at the border while attempting to unlawfully return to the United States.  In 2011, he pled guilty to attempting to illegally reenter the United States, in violation of 8 U.S.C. § 1326, and received a sentence of five years' probation.  A standard term of his probation provided he "shall not commit another federal, state, or local crime."

After returning to Mexico, Argueta began to abuse methamphetamine.  A few days before the border crossing that is the subject of this appeal, he was beaten by gang members in Mexico.  In the days that followed, according to Dr. Bruce Yanofsky, the court-appointed psychologist who testified at trial, Argueta became "increasingly paranoid, he was worried, he started to see people that were following him and was really concerned about his life."

> [H]e was living out on the streets, running around until he got to the point where he felt that his life was in danger and then obviously . . . proceeded to try to cross the border with the account that he gave me that he had the cell phone, that it was a land line – well, it was connected to a line in the United States, he was trying to call for help, he was calling 9-1-1 repeatedly because he wanted law enforcement to intervene because he had tried the Mexican law enforcement to help him and they didn't do anything for him.  So in this state of panic, paranoia, and just losing

> control of what was going on in his life,
> fearing for his life, he ended up in the border.

No cell phone was found on Argueta's person at the time of his arrest, however.

Argueta crossed the United States border from Mexico, about one and one-half miles west of the San Ysidro, California, port of entry, on November 29, 2013. At the border, Argueta climbed over the approximately 10-foot primary fence, which placed him in the United States. He was at that point between the primary fence and the secondary fence, which is approximately 50 yards north of the primary fence and about 20 feet high. Argueta was spotted by Border Patrol Agent Oscar Alvarado when Argueta was approximately 15 yards north of the primary fence. Argueta was walking, at a normal speed, in a north and westbound direction. Agent Alvarado radioed another officer to intercept Argueta.

Border Patrol Agent Jeffrey Schwinn responded. Agent Schwinn approached in his vehicle to approximately 20 feet away, exited his vehicle and shouted "Hey" to try to get Argueta's attention. When Argueta did not respond, Agent Schwinn approached Argueta. Argueta turned around and looked at Schwinn, at which point Schwinn asked him in Spanish where he was born. Argueta said Mexico City. Schwinn asked Argueta what country he was a citizen of, and he said Mexico, so Schwinn proceeded to ask him if he had any immigration documents allowing him to enter the United States, and he said no. At that point, Argueta began to walk towards Schwinn, and Schwinn told him to head back south and return to Mexico. When Argueta did not take that suggestion, Agent Schwinn told him he was going to place

him under arrest, and Argueta said something to the effect of "you do what you got to do."

About two hours after his arrest, two border patrol agents interviewed Argueta at the Imperial Beach Border Patrol Station in San Diego. During the beginning of the interview, which was conducted in English, Argueta appeared calm and rational. Early in the interview, Argueta asked to make a statement, saying "[i]t's important. It relates to what happened at my house." One of the agents told Argueta he would be able to make a statement later. At one point during the interview, one of the agents asked Argueta, "When did you last enter the United States," and this discussion followed:

> A. Last was five years ago. Five years ago, almost five and a half.
>
> Q. How did you enter the United States?
>
> A. Trying to go through the line walking.
>
> Q. Through where?
>
> A. I was walking through Calexico, from Mexicali to Calexico.
>
> Q. The port of entry?
>
> A. Exactly.
>
> Q. What is your destination in the United States, city and state?

> A.  Los Angeles, California.

> Q.  Do you have any . . . fear of persecution or torture should you be removed from the United States?

> A.  Yes, I do.

The agents did not follow up on Argueta's claim of persecution.

Toward the end of the interview, when the agents asked Argueta whether he wanted to say anything else, Argueta made apparently delusional statements for two minutes, referring to people who were in the cell with him even though the only people there were Argueta and the two border patrol agents:

> A.  Just that I come – the people who I'm with right now in the tank are the people who were at my house.

> Q.  In here in the cell?

> A.  (Inaudible.)  And also, I wanted to ask you guys if it's coincidental or (unintelligible). And that's when one of the (unintelligible) started asking me what's up.  I told them I noticed I recognize the skinny guy, the one they put at the end.  (Unintelligible) the other one with white shorts (unintelligible).  He started taking his hand out.  Before that I told the skinny dude, hey, I know you, bro.  It hurts me, because that's my wife, you know.

> But then again, I don't know what's going on. Like I said, I was going nuts over there. I couldn't remember. I had to ask my wife. I mean, there's some pictures I seen. I can't recognize certain people (unintelligible). I was going through it and not only (unintelligible) that's the people that are after me. (Unintelligible.)

In February 2014, Argueta was charged with attempting to reenter the United States, in violation of 8 U.S.C. § 1326(a) and (b).[1]  He was separately charged with violating the terms

---

[1] Section 1326(a) states:

> (a) In general

> Subject to subsection (b) of this section, any alien who —

> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

of his 2011 probation.  The district court appointed Dr. Yanofsky to determine whether Argueta was competent to stand trial.  After Argueta was found competent, the case proceeded to a bench trial.  At trial, Dr. Yanofsky testified that, on the day Argueta climbed over the border fence, he was suffering from a substance-induced psychosis caused by heavy methamphetamine use.  According to Dr. Yanofsky, Argueta was operating under a delusion that individuals were chasing him and trying to kill him, prompting him to climb over the border fence.   An expert proffered by the government, Dr. Mark Kalish, disagreed with Dr. Yanofsky's conclusion that Argueta was suffering from substance-induced psychosis.

At the close of evidence, the parties presented closing arguments to the district court.  The elements of the crime of attempted illegal reentry under § 1326 are: "(1) the defendant had the purpose, i.e., conscious desire, to reenter the United States without the express consent of the Attorney General; (2) the defendant committed an overt act that was a substantial step towards reentering without that consent; (3) the defendant was not a citizen of the United States; (4) the defendant had previously been lawfully denied admission, excluded, deported or removed from the United States; and (5) the Attorney General had not consented to the defendant's attempted reentry."  *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000) (en banc).

---

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

Section 1326(b) provides enhanced penalties for certain defendants.

Here, only the first element was in dispute. Relying on *United States v. Lombera-Valdovinos*, 429 F.3d 927 (9th Cir. 2005), Argueta's counsel argued "the government cannot prove specific intent beyond a reasonable doubt because the evidence in this case showed that Mr. Argueta entered the United States under the psychotic belief that he was being chased by armed gunmen in Mexico, but he specifically – while that may be the motive, he specifically intended to enter to find protection" by turning himself in to the border patrol. According to Argueta's counsel, Argueta was not guilty of the crime of attempted illegal reentry if the evidence showed that his "specific intent . . . was to go into custody." Counsel maintained that, under *Lombera-Valdovinos*, "if someone specifically intends to enter the United States to go into custody, they're affirmatively not guilty under the attempted reentry charge of [§] 1326."

The district court rejected Argueta's argument. In the court's view, the specific intent element of attempted illegal entry would be satisfied so long as Argueta "knew he was vaulting the fence into the United States and he knew that that was wrong." The court rejected the proposition that Argueta could negate the specific intent element merely by showing he intended to enter into custody, disagreeing with Argueta's argument that "the reason of coming over here to turn yourself in is enough to defeat conscious purpose." According to the court, if the defense was "right that the desire to turn yourself in, even if it's based on a delusion, is enough to defeat conscious purpose, the appellate court will tell us. I don't think it is."

Having rejected Argueta's legal argument, the court proceeded to find the specific intent element proven beyond a reasonable doubt because Argueta (1) knew he was crossing

into the United States and (2) knew he did not have permission to do so, facts Argueta did not dispute. Accordingly, the court found Argueta guilty of the crime of attempted illegal reentry. In addition, solely on the basis of that conviction, the court also found Argueta guilty of violating the terms of his 2011 probation. The court later sentenced Argueta to 21 months in custody on the attempted illegal reentry conviction and an additional 12 months in custody on the probation violation, to be followed by three years of supervised release. Argueta timely appealed both judgments, and the two appeals have been consolidated in this court.

## II

Conclusions of law following a bench trial are reviewed de novo. *See Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011); *cf. United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997) ("If a jury instruction misstates elements of a statutory crime, the standard of review is . . . *de novo*.").

## III

## A

This case is controlled by *Lombera-Valdovinos*, where we held it was "[im]possible to convict a previously deported alien for attempted illegal reentry into the United States under 8 U.S.C. § 1326 when he crosses the border with the intent only to be imprisoned . . . , because attempted illegal reentry is a specific intent crime that requires proof of intent to enter the country free from official restraint." 429 F.3d at 928.

In *Lombera-Valdovinos*, a border patrol agent was patrolling the border between the United States and Mexico, sitting in a marked border patrol vehicle between the primary fence, which marks the actual border, and the secondary fence, located about 100 feet north of the primary fence. *See id.* With binoculars, the agent saw the defendant and four or five others standing on the Mexico side of the border, about 200 yards away from the agent. *See id.* The agent then looked away for about 15 seconds; when he turned back, he saw the defendant, alone and now on the United States side of the primary fence, walking directly toward him. *See id.* When the defendant continued to walk toward the agent, the agent drove toward him. *See id.* When they met, the defendant stated, "I want to see an immigration judge," admitted to being a citizen of Mexico and, when asked if he had any legal basis for being present in the United States, answered "No." *Id.* He also said he "wished to go back to jail." *Id.* The agent then searched and arrested the defendant. *See id.*

Because the defendant had been deported before, he was charged with attempted illegal reentry, in violation of § 1326. *See id.* After a jury returned a guilty verdict, the defendant moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. *See id.* at 927–28. The district court denied the motion, and the defendant appealed. *See id.* Reviewing the evidence in the light most favorable to the government, we held that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See id.* at 930.

We explained that, "for purposes of § 1326, 'enter' has a narrower meaning than its colloquial usage." *Id.* at 928. "An alien has not entered the United States under § 1326 unless he

does so 'free from official restraint.'" *Id.* (quoting *Gracidas-Ulibarry*, 231 F.3d at 1191 n.3). Attempted illegal reentry, in turn, "requires proof of specific intent, more particularly the specific intent 'to reenter without consent.'" *Id.* at 929 (citation omitted) (quoting *United States v. Leos-Maldonado*, 302 F.3d 1061, 1063 (9th Cir. 2002)). Official restraint, we further explained, "encompasses restraint by any government official," not just officials of the Department of Homeland Security. *Id.*[2] Because all of the evidence showed "the defendant's intent was to be taken into custody," *id.* at 930 n.3, we held that "no rational trier of fact could conclude . . . the defendant was guilty of the specific intent crime of attempted illegal reentry," *id.* at 930.

As the government now concedes, the district court misapplied *Lombera-Valdovinos* here.[3] In order to convict Argueta, the government was required to prove beyond a

---

[2] At trial in *Lombera-Valdovinos*, the government argued "official restraint" encompassed only restraint by officials of the Department of Homeland Security (DHS), not other forms of official custody. *See* 429 F.3d at 929–30. In the government's view, if the defendant crossed into the United States with the intent to go to jail, then he had the specific intent to enter free from official restraint. *See id.* at 929. We rejected that argument in *Lombera-Valdovinos*, *see id.* at 929–30, and the government does not reassert it here. Indeed, the government conceded the point on appeal in *Lombera-Valdovinos*. *See id.* at 929.

[3] Although the government on appeal has conceded the district court misapplied *Lombera-Valdovinos*, government counsel said nothing in the district court while Argueta's counsel and the court debated the proper legal standard. Had the government pointed out *at that time* that Argueta was articulating the correct legal standard for the specific intent element of attempted illegal reentry, the court might have reached a verdict free from legal error. The government's failure to so advise the court at that time is regrettable.

reasonable doubt that Argueta crossed into the United States with the specific "intent to enter the country free from official restraint." *Id.* at 928.  It was not sufficient that Argueta knew he was crossing into the United States and knew he did not have permission to do so.  If Argueta's sole "intent was to be taken into custody," then "no rational trier of fact could conclude [he] was guilty of the specific intent crime of attempted illegal reentry." *Id.* at 930 & n.3.  The district court's verdict thus rested on an erroneous legal standard.

B

When a district court in a bench trial has made a legal error regarding the elements of an offense, the error is reviewed using the same harmless error standard that would apply to an erroneous jury instruction. *See Wilson v. United States*, 250 F.2d 312, 323–24 (9th Cir. 1957).  "An error in describing an element of the offense in a jury instruction is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Liu*, 731 F.3d 982, 992 (9th Cir. 2013) (internal quotation marks omitted); *see also United States v. Driggers*, 559 F.3d 1021, 1025–26 (9th Cir. 2009). Accordingly, the question here is whether it is clear beyond a reasonable doubt that the district court would have found Argueta guilty absent the error.  The government argues the district court's error was harmless on two independent theories.  We address them in turn, finding neither persuasive.

1

The government argues *Lombera-Valdovinos* applies only when there is *no evidence* of anything other than the intent to be taken into custody.  In the government's view, where, as

here, there is substantial evidence of the defendant's specific intent to enter the United States free from official restraint, *Lombera-Valdovinos* "is of no import," even if there is also substantial evidence of the intent to enter into custody. We disagree, and take this opportunity to clarify *Lombera-Valdovinos*.

It is true that in *Lombera-Valdovinos* we said "this case presents a rare set of factual circumstances where there is *no evidence* of anything other than the intent to be taken into custody." 429 F.3d at 930 n.3 (emphasis added). We made that statement, however, in the course of reviewing the denial of the defendant's Rule 29 motion for judgment of acquittal. *See id.* at 928, 930. Under that standard, we were required to affirm the defendant's conviction so long as any rational trier of fact could have found he possessed the specific intent to enter free from official restraint. *See id.* Thus, by pointing to the complete absence of contrary evidence, we were simply applying that highly deferential standard of review. We did not hold that any evidence of an unlawful intent would compel a conviction. We now clarify that where, as here, there is contradictory evidence regarding the defendant's intent, it is for the trier of fact to determine whether the government has proven unlawful intent beyond a reasonable doubt. The government's contention that *Lombera-Valdovinos* is limited to cases in which there is no evidence of a specific intent to enter the United States free from official restraint is without merit. We reject the government's argument the district court's error was harmless on this ground.

That being said, we also clarify that the government need not prove that entry free from official restraint was the defendant's *sole* intent. The government must prove only that

Argueta had *a* specific intent to enter the United States free from official restraint, not that this was his only purpose. *See Lombera-Valdovinos*, 429 F.3d at 928 (noting the defendant "cross[ed] the border with the intent *only* to be imprisoned" (emphasis added)); *cf. United States v. Shabban*, 612 F.3d 693, 696 & n.1 (D.C. Cir. 2010) ("As Shabban concedes, evidence that a defendant had multiple intentions does not mean there was insufficient evidence of the requisite statutory intent."); *United States v. Julian*, 427 F.3d 471, 485 (7th Cir. 2005) ("A defendant need not facilitate someone's interstate or foreign travel with the *sole* or *principal* intent that he engage in prostitution in order to be liable under section 2421, so long as prostitution was *a* significant motive."); *United States v. Fairchild*, 122 F.3d 605, 612 (8th Cir. 1997) (holding that "only one of the [defendant's] intentions must meet the elements of the offense"); 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2 (2d ed. 2015) ("It may be said that, so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention."). Similarly, if Argueta "actually intended to sneak into the country, and changed his plans only when he was spotted" by the border patrol, he again would be guilty. *Lombera-Valdovinos*, 429 F.3d at 930.

2

In the alternative, the government contends the error was harmless because there was overwhelming evidence of Argueta's intent to enter free from official restraint. We again disagree.

There was, to be sure, evidence that Argueta crossed the border with the specific intent to enter free from official restraint. He scaled a border fence in an area in which,

according to one border patrol agent's testimony, there was a 50–50 chance of evading detection. If he had wanted to turn himself in, he could have presented himself at the port of entry located less than two miles away. When he crossed into the United States, Argueta was walking away from Agent Alvarado rather than toward him. When Agent Schwinn first shouted to Argueta, he did not stop. In his initial encounter with Agent Schwinn, Argueta did not say he was seeking protective custody. When asked his destination during his post-arrest interview, Argueta identified Los Angeles.

Evidence also pointed in the other direction, however. Argueta crossed into the United States in broad daylight in a heavily patrolled area. When Agent Alvarado spotted him on the United States side of the primary fence, he was walking normally, not running. When he was confronted by Agent Schwinn, Argueta did not run. When Agent Schwinn offered Argueta the opportunity to climb the fence back into Mexico rather than being arrested, Argueta declined the offer – evidence fully consistent with Argueta's contention that he crossed into the United States to enter protective custody. Dr. Yanofsky testified Argueta was under a drug-induced psychosis, suffering from delusions, and had entered the United States to seek protection, testimony the district court credited. Argueta told Dr. Yanofsky he made numerous calls to 9-1-1 before reaching the United States border in a further attempt to obtain protection from United States authorities (although no phone was found on Argueta's person when he was arrested). In his post-arrest interview, Argueta referred to people chasing him and said he was in fear of persecution and torture; and Argueta's bizarre behavior at the post-arrest interview confirmed his delusional state. Although Argueta did not cross at the port of entry, the district court found this was consistent with Argueta's perceptions of an immediate

threat to this life. Although Argueta told the agents his destination was Los Angeles, he could have easily misunderstood this question in context as referring to his earlier crossing into the United States.

For these reasons, it is not clear beyond a reasonable doubt the district court would have found Argueta guilty absent its misapprehension of the specific intent element. The error therefore was not harmless.[4]

IV

In his concurring opinion, Judge Bybee suggests our court should use this case as a vehicle to reconsider en banc three sets of circuit precedents: (1) our holdings in cases such as *United States v. Oscar*, 496 F.2d 492, 493–94 (9th Cir. 1974), and *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163–66 (9th Cir. 2000), that, for immigration purposes, "entry" is a term of art that requires not only physical presence in the United States but also freedom from official restraint; (2) our holding in *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1193 (9th Cir. 2000) (en banc), that attempted illegal reentry under 8 U.S.C. § 1326 is a specific intent crime; and (3) our holding in *United States v. Lombera-Valdovinos*, 429 F.3d 927, 929 (9th Cir. 2005), that "official restraint" encompasses restraint by government officials other than those of the Department of Homeland Security (DHS). In our view, each of these precedents rests on a solid footing.

---

[4] Argueta argues remand is not required because the district court has already found a reasonable doubt as to whether he crossed into the United States with the specific intent to enter the country free from official restraint. Having reviewed the record, we are not persuaded the district court has made such a finding. We therefore reject Argueta's argument.

A

Judge Bybee would have us reconsider our longstanding view that, for immigration purposes, "entry" is a term of art requiring not only physical presence in the United States but also freedom from official restraint. As Judge Bybee recognizes, this principle was established more than a century ago, *see, e.g.*, *Ex parte Chow Chok*, 161 F. 627, 628–31 (N.D.N.Y.), *aff'd* 163 F. 1021 (2d Cir. 1908), and has long been recognized not only by this court but also by the Supreme Court, *see Kaplan v. Tod*, 267 U.S. 228, 230–31 (1925); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905), other federal circuits, *see, e.g.*, *Dimova v. Holder*, 783 F.3d 30, 39 (1st Cir. 2015); *Correa v. Thornburgh*, 901 F.2d 1166, 1171–72 (2d Cir. 1990); *Parra-Rojas v. Att'y Gen. U.S.*, 747 F.3d 164, 170 (3d Cir. 2014); *United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000); *Vitale v. INS*, 463 F.2d 579, 581–82 (7th Cir. 1972); *Nyirenda v. INS*, 279 F.3d 620, 623 (8th Cir. 2002), and the Board of Immigration Appeals, *see, e.g.*, *Matter of Martinez-Serrano*, 25 I. & N. Dec. 151, 153 (BIA 2009); *Matter of Pierre*, 14 I. & N. Dec. 467, 468–69 (BIA 1973). Judge Bybee offers no persuasive justification for casting aside this longstanding and widely accepted understanding of what it means to enter the United States.

Judge Bybee perhaps believes this understanding of "entry" should be preserved for immigration purposes generally but should not apply to *criminal* immigration laws such as 8 U.S.C. §§ 1324, 1325 and 1326. Concurrence at 30–34. Here again, however, Judge Bybee's view conflicts not only with the longstanding law of this court but also with the law of other circuits. *See, e.g.*, *United States v. Macias*, 740 F.3d 96, 100 (2d Cir. 2014); *Angeles-Mascote*, 206 F.3d

at 531; *United States v. Cardenas-Alvarez*, 987 F.2d 1129, 1133 (5th Cir. 1993); *United States v. Kavazanjian*, 623 F.2d 730, 736–37 (1st Cir. 1980); *United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954). We see no reason for adopting one meaning of entry for immigration purposes generally but a different meaning for criminal immigration laws, much less doing so to create a circuit split.

Indeed, there are at least two persuasive reasons for continuing to adhere to this longstanding and widely accepted doctrine. First, as Judge Bybee recounts, the doctrine has been around for decades, and, although Congress has amended the criminal immigration laws in the interim, it has never called into question or expressly overruled the firmly established judicial gloss on "entry." As the Supreme Court has observed on many occasions, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009) (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)); *see, e.g.*, *Hing Sum v. Holder*, 602 F.3d 1092, 1100–01 & n.8 (9th Cir. 2010) (interpreting the word "admission" in § 1101(a)(13)(A) in light of existing BIA precedent requiring freedom from restraint).[5]

---

[5] Judge Bybee suggests the official restraint doctrine may no longer be valid after the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), which he says "eliminated the concept of 'entry' from the INA altogether." Concurrence at 35–36 n.3. This argument is unpersuasive. First, the provision Judge Bybee focuses on, 8 U.S.C. § 1101(a)(13)(A), expressly continues to rely on the concept of "entry," by using that term as part of the definition of "admission." Second, as Judge Bybee acknowledges, we have already held, in *Pacheco-Medina*, 212 F.3d at 1166, that IIRIRA's changes to § 1101(a)(13)(A) did not alter the established meaning of "entry" under § 1326. Third, when

Second, the official restraint doctrine is a practical necessity. In its absence, mere physical presence in the United States, without permission, would give rise to criminal liability for illegal reentry under § 1326. *See United States v. Barragan-Cepeda*, 29 F.3d 1378, 1381 (9th Cir. 1994) (listing the elements of § 1326). We doubt Congress intended to make criminals out of persons who, for any number of innocent reasons, approach immigration officials at the border. Because "in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation," "freedom from official restraint must be added to physical presence before entry is accomplished." *Vasilatos*, 209 F.2d at 197.

B

Judge Bybee also questions our holding in *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1190, 1196 (9th Cir. 2000) (en banc), that attempted illegal reentry is a specific intent crime, citing four circuits that have rejected that proposition – *United States v. Rodriguez*, 416 F.3d 123, 125 (2d Cir. 2005); *United States v. Morales-Palacios*, 369 F.3d 442, 445–49 (5th Cir. 2004); *United States v. Peralt-Reyes*,

---

Congress adopted IIRIRA in 1996, it also retained and even expanded the use of the term "entry" under §§ 1325 and 1326. *See* Pub. L. No. 104-208, Div. C, Title I, § 105, Title III, § 305 (1996). Given that "entry" had a firmly established meaning at that time – freedom from official restraint – we can infer that Congress intended to retain that meaning when it adopted IIRIRA. *Lezama-Garcia v. Holder*, 666 F.3d 518 (9th Cir. 2011), upon which Judge Bybee relies, did not address the "official restraint" doctrine or the meaning of entry under §§ 1325 and 1326, and therefore does not cast doubt on our longstanding precedent applying the official restraint doctrine to entry under §§ 1325 and 1326.

131 F.3d 956, 957 (11th Cir. 1997); *United States v. Reyes-Medina*, 53 F.3d 327, at *1 (1st Cir. 1995) (unpublished). Concurrence at 39 & n.5.  All four of those cases, however, were decided before the Supreme Court's decision in *United States v. Resendiz-Ponce*, 549 U.S. 102, 106–07 (2007), which confirmed that the attempt prong of § 1326 incorporates the common law meaning of attempt, including an element requiring the specific intent to commit the underlying crime.  *Resendiz-Ponce* confirms that *Gracidas-Ulibarry* was correctly decided.

C

Finally, Judge Bybee questions our holding in *United States v. Lombera-Valdovinos*, 429 F.3d 927, 929 (9th Cir. 2005), that official restraint "encompasses restraint by any government official, not just officials of DHS," the Department of Homeland Security.  Concurrence at 40.  He contends official restraint has "always been limited to physical restraint or surveillance of an alien by a government officer operating at or just inside the border."  Concurrence at 40.

Official restraint, however, "need not be by immigration officers," *Correa v. Thornburgh*, 901 F.2d 1166, 1172 (2d Cir. 1990); *see, e.g.*, *Zhang v. Slattery*, 55 F.3d 732, 753, 755 (2d Cir. 1995) (shipwrecked alien restrained by local police upon reaching shore), *superseded by statute on other grounds as recognized in City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 201 (2d Cir. 2010); *Edmond v. Nelson*, 575 F. Supp. 532, 535 (E.D. La. 1983) (aliens seeking entry by sea "restrained" by the master of a rescuing ship, acting pursuant to government regulations); *Matter of Yam*, 16 I. & N. Dec. 535, 536–37 (BIA 1978)

(alien found at the border and taken under guard by local police to a medical facility), and it need not be at the border, *see Kaplan v. Tod*, 267 U.S. 228, 229 (1925) (holding a girl was under official restraint even though she was "handed over to the Hebrew Sheltering and Immigrant Aid Society," which in turn allowed her to live with her father).

The position Judge Bybee advances in his concurrence is contrary not only to this precedent but also to the position the government itself argued to us in *Lombera-Valdovinos*, where the government expressly rejected the proposition that "*only* Department of Homeland Security restraint constitutes official restraint under section 1326." The government argued there that "an alien is not deemed to have entered unless he is free to go at large" within the United States, the very principle we followed in *Lombera-Valdovinos*. Judge Bybee, therefore, is seeking to relitigate a rule of law the government expressly advocated for in *Lombera-Valdovinos* – and which it has not asked us to reconsider now.

Nor has Judge Bybee suggested a rationale for criminalizing conduct such as that engaged in by the defendant in *Lombera-Valdovinos*. Lombera-Valdovinos crossed the border, walked directly up to a border control agent and asked to be taken into custody. He never sought to evade detection. He never sought the freedom to go at large within the United States. He neither sought nor "gained a foothold in the United States." *Kaplan*, 267 U.S. at 230. We see no reason Congress would have intended § 1326 to reach such conduct.

Judge Bybee alternatively suggests *Lombera-Valdovinos* should be reconsidered on a practical ground – because it would allow defendants to avoid liability for attempting to

reenter the United States by opportunistically asserting, after detection, that they crossed into the country solely to be placed into official custody. Concurrence at 43–44. He argues requiring the government to prove beyond a reasonable doubt that the defendant had the specific intent to enter the United States free from official restraint imposes too great a burden on prosecutors.

This speculation seems unfounded. When a person is spotted by border patrol agents crossing into the United States, away from an official port of entry, this alone is compelling evidence that the person intends to achieve not only physical presence in the United States but also freedom from official restraint. *Cf. United States v. Quintana-Torres*, 235 F.3d 1197, 1200 (9th Cir. 2000) (noting an alien's presence in the United States would provide convincing proof of the alien's intention to be here unless adequately explained away, "much as a face covered by jam near a jam jar is convincing proof of jam-eating unless otherwise explained"). Certainly there may be unusual cases in which persons could be acquitted of attempted illegal reentry where, as in *Lombera-Valdovinos*, they cross the border, walk directly up to a border control agent and ask to be taken into custody. But such cases present "a rare set of factual circumstances." *Lombera-Valdovinos*, 429 F.3d at 930 n.3. In the more than 10 years *Lombera-Valdovinos* has been on the books, it has not, to our knowledge, hindered effective prosecution of those who attempt to enter the United States unlawfully. Indeed, we are aware of only a single case – *Lombera-Valdovinos* itself – in which an individual has been acquitted on this ground.

V

Because the district court applied an incorrect legal standard, we vacate Argueta's conviction and sentence in No. 14-50384 and vacate the revocation of supervised release and sentence in No. 14-50385.   We remand for proceedings consistent with this opinion.

**VACATED AND REMANDED.**

---

BYBEE, Circuit Judge, concurring in the judgment and dissenting as to everything else:

I agree with the majority that the specific-intent standard that governs Argueta-Rosales's case is supplied by *United States v. Lombera-Valdovinos*, 429 F.3d 927, 928–30 (9th Cir. 2005).   Because the district court failed to apply that standard, and because we are bound by *Lombera-Valdovinos*, I concur in the majority's judgment vacating the conviction and remanding this case for retrial.  Maj. Op. at 19.

In all other respects, however, I dissent.  I am convinced that *Lombera-Valdovinos* was wrongly decided and that our understanding of when an alien is "free from official restraint" has reached an absurd position.  Under *Lombera-Valdovinos*, an alien is not guilty of attempted illegal reentry even if he crosses into the United States surreptitiously and outside a port of entry, so long as he tells border control that he came in hopes of remaining under restraint by *any* government official—even in a federal prison far from the border—once in the United States.  Judge Rymer rightly pointed out in dissent from *Lombera-Valdovinos* that this

novel and unduly expansive definition of "official restraint" makes no sense and creates a puzzling loophole in the law of attempted illegal reentry. *See Lombera-Valdovinos*, 429 F.3d at 931–33 (Rymer, J., dissenting). The passage of time has done nothing to blunt the force of her critique. It is time we revisited *Lombera-Valdovinos*.

I

I begin by tracing the history that led up to *Lombera-Valdovinos*, because it was a case in which "what's past [was] prologue." William Shakespeare, *The Tempest* act 2, sc. 1. Over roughly the last 100 years, the term "entry" has taken on a "narrower meaning than its colloquial usage" in the context of immigration law. *Lombera-Valdovinos*, 429 F.3d at 928. For purposes of 8 U.S.C. §§ 1325–26, an alien is considered not to have effected an "entry" into the United States unless he not only "cross[es] the . . . border," but does so "free from official restraint." *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1218 (9th Cir. 2001). The provenance of the official restraint doctrine—and the future of the doctrine, as evidenced by *Lombera-Valdovinos* and this case—should make us rethink the concept of what it means to enter the United States.

A

Courts adopted this peculiar definition of "entry"— freedom from official restraint—because, for many years, immigration law drew a distinction between *exclusion* and *deportation*. Excluded aliens were those who were summarily sent home at the border, in contrast to aliens who were afforded the more elaborate process of deportation because they were "already physically in the United States."

*Landon v. Plasencia*, 459 U.S. 21, 25 (1982).  *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.").  The distinction was a crucial one.  By virtue of their presence in the United States, aliens in deportation proceedings had greater procedural and substantive rights than aliens in exclusion proceedings—an administrative hearing and an appeal, the right to designate the country of deportation, and the right to seek voluntary departure.  *Landon*, 459 U.S. at 26.  By contrast, an excludable alien is a determination at the border, "usually . . . at the port of entry."  *Landon*, 459 U.S. at 25.  As the Court explained in *Zadvydas*, "certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders.  But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens."  533 U.S. at 693.  *See generally* David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Meaning of Zadvydas v. Davis*, 2001 Sup. Ct. Rev. 47, 92–100.

The distinction between excludable and deportable aliens required courts to confront a largely metaphysical, but tricky immigration law problem:  What was to be done about aliens who physically crossed the United States border but never reached the point of being able to move freely within the country and mix with the general population?  The paradigm example for this is an alien who presents himself at a port of entry and is taken to a "secondary inspection" area, technically across the international border, for further investigation into whether he is authorized to enter the United States.  Was the alien now entitled to a deportation

proceeding because border agents walked him a few feet across the border?  The courts responded to this conceptual ambiguity about which due process rights apply in the immigration context by developing the "legal fiction that entry is not accomplished until a person is free from official restraint."  *United States v. Parga-Rosas*, 238 F.3d 1209, 1213 (9th Cir. 2001).  Under this legal fiction, an alien who never made it out of a port of entry, who was held temporarily by the United States, or who crossed the border at some other place but was never outside the control of the border authorities, would be deemed not to have entered the United States despite having done so in a literal sense.  *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 230 (1925) ("[W]hile she was at Ellis Island she was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared."); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905) (holding that an alien detained at a port of entry, "although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate").

Although it was relatively easy to determine whether an alien entered the United States when he presented himself for inspection at a port of entry, it was more complicated to determine if an alien had entered the United States when he was interdicted inside the United States, but near the border. The case generally credited with inaugurating the official restraint doctrine in this area is a Chinese exclusion case, *Ex Parte Chow Chok*, 161 F. 627 (N.D.N.Y.), *aff'd*, 163 F. 1021 (2d Cir. 1908).  *See Lombera-Valdovinos*, 429 F.3d at 929; *Pacheco-Medina v. Untied States*, 212 F.3d 1162, 1163–64 (9th Cir. 2000).  In that case U.S. inspectors had tracked eight Chinese aliens as they crossed from Canada into the United

States.  The aliens were "kept . . . in sight," stopped a quarter of a mile inside the United States, and taken into custody. *Chow Chok*, 161 F. at 628.  The aliens filed for a writ of habeas corpus, contending that, because they had successfully entered the United States, they could only be deported, not excluded.  The court found, however, that the aliens had not successfully entered the United States because "from the moment when they crossed the border, they were in the actual, though not formal, custody of the inspectors."  *Id.* at 630.  Accordingly, they were only entitled to administrative processing and could be excluded.

B

Although the "entry fiction" doctrine began life as a means of excluding aliens at or near the border without affording them deportation proceedings, it soon crossed over into the realm of criminal law.  Courts began to interpret the term "enter," in criminal statutes, as a term of art whose meaning roughly corresponded to the contours of the entry fiction doctrine in immigration law.

For example, in *United States v. Vasilatos*, 209 F.2d 195 (3d Cir. 1954), a Greek seaman who had previously been deported from the United States falsely represented to an immigration officer at the Port of Philadelphia that he had never been deported and thereby gained temporary admission to the United States.  *Id.* at 196–97.  The seaman stayed on his ship until it called at Baltimore, where he disembarked and headed inland.  When he was apprehended in New York a year later, he was charged with illegal reentry.  *Id.* at 197. The government alleged that the seaman had "entered" the United States at Philadelphia, making that city the proper venue for his trial; the seaman argued that his entry had

occurred at Baltimore and that Baltimore was thus the proper venue. *Id.*

The then-prevailing illegal reentry statute (8 U.S.C. § 180 (1946)) did not define what constituted an "entry" into the United States, and there was no general definition of the term elsewhere in Title 8, so the Third Circuit—understandably—looked to the "official restraint" cases for guidance as to when an entry occurred. The court observed that "administration of the immigration laws has long proceeded on th[e official-restraint] theory of entry" and saw "no reason to disturb" that theory in the context of the criminal law. *Vasilatos*, 209 F.2d at 197. It therefore held that the seaman had "entered" the United States at Philadelphia, where his fraudulently obtained clearance for temporary admission had first given him freedom from official restraint, rather than at Baltimore, where he had physically landed in the country. *Id.*

After the relevant events in *Vasilatos* occurred, but before the Third Circuit issued its decision, Congress enacted the Immigration and Nationality Act of 1952, which collected and reorganized the various provisions of American immigration law in one place: Title 8. The Act's definitional provision defined the term "entry" very broadly as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise." 8 U.S.C. § 1101(a)(13) (1952). But despite the facial breadth of this definition, the courts were unwilling to do away with the traditional requirement of freedom from official restraint. Rather, they simply assumed without much explanation that § 1101(a)(13) had incorporated the preexisting judicial doctrine of official restraint. *See, e.g.*, *In re Dubbiosi*, 191 F. Supp. 65, 66 (E.D. Va. 1961) (acknowledging the adoption of 8 U.S.C. § 1101(a)(13) but

stating that "[w]e do not believe, however, that this definition removes the requirement of establishing not only physical presence, but also freedom from official restraint, before 'entry' is accomplished").

At our first opportunity, in *United States v. Oscar*, 496 F.2d 492 (9th Cir. 1974), we adopted the same view of what constitutes an "entry" for *criminal* purposes. Oscar and an accomplice arranged for two Honduran nationals to be driven to the San Ysidro Point of Entry, where the Hondurans lied to customs officials and said they were United States citizens. The Hondurans were taken to secondary inspection and later arrested. *Id.* at 492–93. Oscar was subsequently convicted under 18 U.S.C. § 2 of aiding and abetting an illegal entry into the United States.

We reversed the conviction, holding that Oscar could not be guilty of aiding and abetting because the two Hondurans had not committed the underlying offense of illegal entry under 8 U.S.C. § 1325. We acknowledged that the two had come into the United States "[i]n a physical sense" when they moved to secondary inspection, which ostensibly was enough to satisfy the broad definition of "entry" in the 1952 Act. *Oscar*, 496 F.2d at 493. But we agreed with *Vasilatos*'s and *Dubbiosi*'s holdings that "entry," for immigration-related purposes, requires freedom from official restraint. *Id.* at 493–94. We reasoned that although *Vasilatos* and *Dubbiosi* were not factually analogous to Oscar's case, it made sense for us to adopt their approach to "entry" because Congress had chosen to define "entry" in § 1101(a)(13), and it was "unlikely that Congress would define a term in § 1101 . . . if it intended the term to have different meanings" in different

contexts. *Id.* at 493–94.[1]  That consideration, along with the rule of lenity, led us to conclude that the Hondurans had not "entered" the United States because they had not left the Port of Entry and thus never escaped "official restraint."  *Id.* at 494.

In subsequent cases interpreting 8 U.S.C. § 1326, the illegal-reentry statute, we adopted the same view of "entry" that *Oscar* applied under § 1325, holding that an illegal reentry required both physical entry into the country and freedom from official restraint.[2]  For example, in *United States v. Martin-Plascencia*, 532 F.2d 1316 (9th Cir. 1976), the defendant was charged with unlawful entry.  He had gone near the port of entry at San Ysidro and crawled through a hole in one chain link fence and under a second.  He was caught 50 yards into the United States.  We rejected his argument that he was under official restraint because he had not "reach[ed] the streets of San Ysidro":

> while nominally within the confines of the Port of Entry, [defendant] was at no instant up until the moment of his arrest under any type

---

[1] *Oscar* seems to have assumed in error that *Vasilatos* rested on an interpretation of § 1101(a)(13)'s definition of "entry."  *Oscar*, 496 F.2d at 493–94. But *Vasilatos* expressly stated that it did not.  The *Vasilatos* opinion issued after § 1101(a)(13) was adopted, but the relevant events occurred before the statute took effect.  *Vasilatos*, 209 F.2d at 196–97. Thus, when we considered the import of § 1101(a)(13) in *Oscar*, we were writing on a cleaner slate than we realized.

[2] *See, e.g.*, *United States v. Gonzalez-Torres*, 309 F.3d 594, 598–99 (9th Cir. 2002); *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1218–19 (9th Cir. 2001); *United States v. Castellanos-Garcia*, 270 F.3d 773, 775–77 (9th Cir. 2001).

of official restraint, but to the contrary was
exercising his free will, youthful enterprise,
and physical agility in evading fixed barriers
in accomplishing his entry.

*Id.* at 1317. *See also United States v. Aguilar*, 883 F.2d 662
(9th Cir. 1989).

## C

We substantially broadened our understanding of the
official restraint doctrine in *United States v. Pacheco-Medina*,
212 F.3d 1162 (9th Cir. 2000). Pacheco was climbing the
international fence between the United States and Mexico
when he was picked up by a surveillance camera. The
monitor signaled a Border Patrol agent on a bicycle, and he
arrived just as Pacheco dropped off the fence, "crouched in
preparation for escape in the country at large." *Id.* at 1163.
Pacheco ran, but was quickly apprehended. We overturned
his conviction for unlawful entry because, although he "tried
to get into the country" and, in fact, had succeeded in getting
on U.S. soil without permission, "he was under official
restraint the whole time." *Id.* at 1165. Of course, Pacheco
was not under "official restraint" the "whole time," at least
not in the sense in which immigration law created the
doctrine to distinguish between deportable and excludable
aliens.

It is worth pausing here to consider how far our
conception of "official restraint" had strayed from the
meaning developed in immigration law up until *Pacheco-
Medina*. Recall that the "official restraint" distinction
developed to explain why we gave different due process
rights to aliens who obtained access to the United States

(lawfully or unlawfully) than aliens who presented themselves for admission and, technically—but only technically and temporarily—found themselves standing on U.S. soil. *Pacheco-Medina* said that mere surveillance (even mechanical surveillance) by U.S. authorities was the same "official restraint" as aliens experience when they present themselves at a port of entry.[3]

---

[3] In 1996, Congress refined the INA's concept of lawful entry. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) eliminated the definition of "entry" from the INA altogether, replacing it with the term "admission." *See* Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No. 104–208, § 301(a), 110 Stat. 3009 (1996), *codified at* 8 U.S.C. § 1101(a)(13)(A). Under the new definition "admission" was "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." (emphasis added)). As we recognized in 2011, "IIRIRA replaced 'entry' with [the] new concept [of] 'admission'" and, in so doing, it replaced the dividing line between excludable and deportable aliens with a new dividing line—one between *lawfully admitted* aliens and all other aliens, with the latter now subject to "more general 'removal' proceedings." *Lezama-Garcia v. Holder*, 666 F.3d 518, 527–28 (9th Cir. 2011).

*Pacheco* acknowledged, but rejected out of hand, the changes in definitions in IIRIRA. Although Congress had told us that lawful "admission" required "the lawful entry of the alien . . . *after inspection and authorization*," 8 U.S.C. § 1101(a)(13)(A) (emphasis added), *Pacheco-Medina* said that "[j]ust why [the new definition] should matter at all is far from clear." The fact that IIRIRA eliminated the definition of "entry"—and replaced it with something very different—somehow "ha[d] no significance here." Evidently we believed that Congress had no place in defining "entry": "It certainly does not change the preexisting, and still existing, judicial concept of what an entry is." *Pacheco*, 212 F.3d at 1166 & n.7.

The majority suggests that Congress's change does not matter because: (1) the term "entry" is still used within the definition of "admission," (2) we reached this issue in *Pacheco*, and (3) Congress retained the use of the term "entry" in other statutory sections. Maj. Op.

*Pacheco-Medina* quickly led to some very strange "how-many-angels-are-dancing-on-the-head-of-a-pin" inquiries. Consider two cases decided shortly after *Pacheco-Medina*. In *Hernandez-Herrera*, Herrera was part of a group of aliens who scaled the international fence. The "still watch" agent had the group under observation, and they were quickly detained by field agents. Herrera, however, escaped the agents and ran into thick brush where, unfortunately for him, he "was free from official restraint because he was no longer visible to the 'still watch' agent. . . . [The field agent] followed Herrera's footprints, and not Herrera." 273 F.3d at 1219. We affirmed Herrera's conviction for illegal reentry. By contrast, in *Gonzalez-Torres*, Border patrol agent Watkins, using binoculars, observed Torres and others enter the United States. Watkins radioed to a second agent, who began pursuit. Although Watkins actually "lost sight of the group 'for a number of seconds,'" we found that this gap in the surveillance was not sufficient to break the officer's "continuous observation." 309 F.3d at 599. We overturned Torres's conviction. The fact that two aliens who commit identical acts and have identical mental states are treated differently based on whether or not a border patrol agent managed to watch them the whole time should give us pause.

---

at 21–22 n.5. But this misses the point. The majority urges that the official restraint doctrine should be adhered to because it "has been around for decades" and Congress has never "called into question . . . the firmly established judicial gloss on 'entry.'" *Id.* at 21. But is not that exactly what Congress has done? Congress decided to eliminate that term of art from the face of the statutory section and replace it with something else. For my present purposes, I do not have to determine what effect IIRIRA might have had on the official restraint doctrine. But, at the least, the question of what changes, if any, IIRIRA worked on the official restraint doctrine deserved more discussion that it received in *Pacheco-Medina*.

As a theoretical matter, moreover, it is far from clear that the concept of official restraint maps onto criminal law particularly well.  Official restraint, after all, was designed to answer the question whether an alien in custody could be excluded or must be deported, whether he was to be afforded minimal procedural rights or plenary rights.  *See Chow Chok*, 161 F. at 628.  We must, of course, determine what "entry" means in convictions under §§ 1325–26.  But our concern has nothing to do with what process the alien is due.  Once an alien has been indicted under either of these sections, the scope of his procedural rights is decided:  he is entitled to a trial by jury, *see* U.S. Const. amend. VI; representation by counsel, *id.*; and the sundry other procedural protections that define our criminal justice system, *id.* amend. V.  "Official restraint" thus ends up being used to answer an entirely different question in criminal cases—*i.e.*, when the *actus reus* of illegal entry or reentry has been accomplished—and, like any repurposed concept, produces some odd results.  For example, the notion that an alien who hops a border fence and makes it a substantial distance into this country has not committed the *act* of entering the United States because he was under constant surveillance defies common sense.  Perhaps this is why neither § 1325 nor § 1326 nor § 1101(a)(13) mentions any such requirement.

The majority provides little reason for adopting the concept of entry which was developed to discern between different due process standards in the immigration context, in the very different context of determining when someone has committed the substantive crime of illegal reentry.  It first warns that the crime of reentry, without the official restraint limitation, would unfairly "make criminals out of persons who, for any number of innocent reasons, approach immigration officials at the border."  Maj. Op. at 22.  I

respectfully disagree that this is a problem.**4**   The lawful
process to enter the U.S. does not include walking across the
border without permission.  That is, by definition, an illegal—
or *unauthorized*—entry.  Whether or not that person happens
to be under surveillance at the time does nothing to change
her culpability.

The majority also suggests that we should continue to
apply the official restraint doctrine in the criminal context
because "the doctrine has been around for decades."  Maj.
Op. at 21.  But the fact that this doctrine was adopted long
ago—without any serious thought either at its inception or
since—is precisely what should give us pause.

## D

There is one final development I must mention.  Prior to
*Lombera-Valdovinos*, an alien who could not be charged with
illegal entry or reentry because he was never free from
official restraint could still be charged with *attempted* illegal
entry or reentry.  *See United States v. Leos-Maldonado*,
302 F.3d 1061, 1063, 1065 (9th Cir. 2002) (holding that an
alien can be guilty of attempted entry even if he is under
official restraint throughout his crossing of the U.S. border).
We held in *United States v. Gracidas-Ulibarry*, 231 F.3d
1188, 1195–96 (9th Cir. 2000) (en banc), that attempted

---

**4** One doesn't have to look beyond this case, *Lombera-Valdovinos,
Gonzalez-Torres*, or *Pacheco* to see that these were not "persons who, for
any number of innocent reasons, approach immigrant officials."  Whether
these persons are scaling the international fence or running through desert
brush, they were not persons seeking to "approach immigration officials"
for "innocent reasons."

illegal reentry is a specific-intent crime.[5]   At the same time we construed the requisite intent broadly, concluding that an alien need only have the "conscious desire[] to reenter the United States without the express consent of the Attorney General." *Id.* at 1196; *see also id.* at 1198 ("§ 1326 requires a finding that the defendant consciously desired to reenter the United States without consent.").   Under this standard, an alien who intentionally crossed the border but did not escape official restraint would usually be guilty of attempted illegal entry or reentry, assuming he could not claim one of the general criminal-law defenses to specific intent. *See, e.g.*, *United States v. Smith-Baltiher*, 424 F.3d 913, 925 (9th Cir. 2005) (holding that a § 1326 defendant was entitled to present a mistake-of-fact defense based on his alleged belief that he was a U.S. citizen); *United States v. Blanco-Gallegos*, 188 F.3d 1072, 1076 (9th Cir. 1999) (considering and rejecting a § 1326 defendant's voluntary-intoxication defense on the merits).

II

Against this legal backdrop, we heard *Lombera-Valdovinos*.   A Border Patrol agent first saw Lombera standing on the Mexico side of the U.S.-Mexico border.   The agent looked away for a brief period, and when he turned back, Lombera was now on the U.S. side of the primary

---

[5] I note that every other circuit to consider the question has disagreed with us, holding that § 1326 does *not* require specific intent. *See United States v. Rodriguez*, 416 F.3d 123, 125–26 (2d Cir. 2005); *United States v. Morales-Palacios*, 369 F.3d 442, 446–48 (5th Cir. 2004); *United States v. Peralt-Reyes*, 131 F.3d 956 (11th Cir. 1997) (per curiam); *United States v. Reyes-Medina,* 53 F.3d 327 (1st Cir. 1995) (per curiam).   As I observe in text, we have given the specific intent requirement a fairly generous reading, which may have effectively narrowed the gap between us.

fence, walking directly toward the agent. The agent drove toward the defendant, and when they met, Lombera said, "I want to see an immigration judge," admitted to being a Mexican citizen, and conceded that he had no legal right to enter the United States. He explained that he had crossed the border because he "wished to go back to jail." Lombera, who had previously been deported several times, was arrested, charged with attempted illegal reentry, and convicted of that offense by a jury. *Lombera-Valdovinos*, 429 F.3d at 928.

We reversed the conviction, holding that no rational trier of fact could conclude that the defendant had the specific intent necessary to be guilty of attempted illegal reentry. We reasoned that because attempted illegal reentry requires the specific intent to reenter the United States without consent, and because an "entry" into the United States requires freedom from official restraint, a defendant "must have the specific intent to reenter 'free from official restraint'" in order to be convicted of attempted reentry under § 1326. *Id.* at 929. And then, crucially, we went on to hold that official restraint "encompasses restraint by *any* government official, not just officials of DHS." *Id.* (emphasis added). Thus, the defendant could not be guilty of attempted illegal reentry, because his intention was to go to jail—where he would be subject to "official restraint" by prison officials. *Id.* at 930.

This reasoning rests on an unprecedentedly expansive view of what constitutes "official restraint." Until *Lombera-Valdovinos*, the concept of "official restraint"—in both the immigration and the criminal context—had never been used to refer to all forms of confinement by any official of the U.S. government. Rather, it had always been limited to physical restraint or surveillance of an alien by a government officer operating at or just inside the border. *See id.* at 931 (Rymer,

J., dissenting) ("[Official restraint] is a term of art for border control."). And for good reason: "Official restraint," recall, is a legal fiction used to distinguish between aliens who are deemed to have been stopped at the border and those who have reached the interior of the United States. This distinction does not turn on what happens to an alien *after* he gets beyond the border. An alien who ends up incarcerated in a federal prison has reached the interior of the United States no less than an alien who crosses the border undetected and then gads about the country at perfect liberty.

*Lombera-Valdovinos*'s three explanations for its expansive view of "official restraint" were unconvincing. First, it cited *Oscar* for the proposition that official restraint is not limited to "officials of DHS," noting that the official doing the restraining in *Oscar* was a "customs official[]." *Id.* at 929 (majority opinion). But although the relevant official in *Oscar* was not, strictly speaking, a border patrol officer, he was working at the San Ysidro Port of Entry and clearly functioning as part of the border control system. *See Oscar*, 496 F.2d at 493. *Oscar* thus shows, at most, that the notion of official restraint does not depend on where precisely an officer stands on an organizational chart. It does not imply that restraint by any government officer, even one not charged with any duty relating to the border, is "official restraint."[6]

---

[6] *Lombera-Valdovinos*'s reliance on *Oscar* as evidence that "official restraint" extends beyond confinement by the Department of Homeland Security is especially curious in light of the fact that since *Oscar*, the Customs Service has been combined with the Border Patrol into one agency (U.S. Customs and Border Protection), which in turn is under the umbrella of DHS. *See* 6 U.S.C. § 542 Note. I doubt it ever made sense, in this context, to draw fine-grained distinctions between "customs

Second, *Lombera-Valdovinos* quoted several cases suggesting that any alien who cannot "go[] at large within the United States" or "mix with the population" is under official restraint. *See Lombera-Valdovinos*, 429 F.3d at 929 (emphasis omitted). But these quotations were misleading. In each of these cases, the court being quoted was discussing an alien who was not at liberty because he was confined *by border control*. These cases do not establish that whenever an alien is not free to "go at large within the United States," he is under "official restraint" as that term is used in immigration law. *Lombera-Valdovinos*'s failure to appreciate that distinction makes clear that although our § 1325 and § 1326 cases initially borrowed the concept of "official restraint" from the immigration context, we have now wrenched it from that context entirely. With each succeeding step, culminating in *Lombera-Valdovinos*, we have gotten further away from what § 1326 plausibly means.

Finally, the *Lombera-Valdovinos* majority suggested that an alien who presents himself to the authorities at the border wanting to go to jail likely perceives no difference between being in the custody of border authorities and being in the custody of "some other United States jailer," given that he is almost certainly unfamiliar with the doctrine of "official restraint." *Id.* at 930 n.2. Hence, the majority argued, such an alien cannot possess the intent required for attempted illegal reentry because he does not "intend[] to avoid or change" his status of being subject to official restraint. *Id.* at 930. But the initial premise of this argument is flawed. An alien who approaches a port of entry and says he wants to go to jail does not want to stay detained at the border forever; he

officials" working at the border and border patrol agents, but it surely does not make sense to do so now.

wishes to go to a prison in the interior and become "part of the United States population, albeit that part of the population which is incarcerated." *Id.* at 931 (Rymer, J., dissenting). By asking to go to jail, he demonstrates that he does not perceive the two forms of custody to be the same. *See id.* at 932–33 ("Lombera-Valdovinos's articulated purpose was to go to a real jail, not to stay in the constructive custody of immigration officials at the border or its functional equivalent.").

In short, none of *Lombera-Valdovinos*'s arguments for construing "official restraint" in the way that it did stands up to scrutiny. The case was wrongly decided, and were it not binding on this panel, I would not follow it.

### III

*Lombera-Valdovinos* assured us that its consequences would be limited, explaining that its holding applied only in the "rare set of factual circumstances where there is no evidence of anything other than the intent to be taken into custody." *Id.* at 930 n.3 (majority opinion). But I remain concerned about the decision's potential ramifications, which this case demonstrates may be far-reaching. As the majority opinion here recognizes, nothing in *Lombera-Valdovinos* limits that case's holding to situations in which an alien walks directly up to a border patrol agent and asks straightforwardly to be escorted to jail. Maj. Op. at 15–16.[7] On the contrary,

---

[7] And even in those cases I would be concerned. Both the majority in *Lombera-Valdovinos* and the majority in this case ignore the possibility that some aliens in unfortunate circumstances—like Argueta-Rosales—may indeed elect to come into the U.S. with a specific intent to reside in

even an alien who—like Argueta-Rosales—acts in ways that strongly suggest his desire to enter the country free from official restraint can assert, if he is apprehended, that he wants to go to jail and thereby claim the protection of *Lombera-Valdovinos*.

The majority here helpfully tries to address these potential concerns by clarifying that in an attempted illegal reentry case, "[t]he government must prove only that [the defendant] had *a* specific intent to enter the United States free from official restraint, not that this was his only purpose." Maj. Op. at 16–17. It predicts that a defendant who "actually intend[s] to sneak into the country, and change[s] his plans only when he [i]s spotted" will be convicted of attempted illegal reentry. I certainly hope that the majority is right. But as the majority reminds us, it is the government's burden in a § 1326 case to "prove[] unlawful intent beyond a reasonable doubt." *Id.* at 16. There surely will be some § 1326 cases in which defendants' dubious claims that they desired to go to jail are nonetheless plausible enough to give the jury reasonable doubt of their guilt, thereby allowing those defendants to "gut the crime of attempted reentry by a play on words." *See Lombera-Valdovinos*, 429 F.3d at 933 (Rymer, J., dissenting). This cannot possibly be how § 1326 is meant to work.

\* \* \*

*Lombera-Valdovinos* has left our law stuck in a catch-22 worthy of Joseph Heller: Aliens who cross the border hoping to enter the United States free of restraint must be restrained,

U.S. prisons. Under *Lombera-Valdovinos*, they may do so without consequence.

while aliens who cross hoping to be restrained by the United States must be freed.  Under the majority's regime, no one gets what he wants, but some people go to jail, while everyone else goes home.  This is a strange state of affairs indeed.  And we could and should have avoided it by holding in *Lombera-Valdovinos* that the specific intent required for attempted illegal reentry is the intent to reenter the United States free from restraint *by authorities at the border*.

The *Lombera-Valdovinos* panel didn't choose that course, so I am compelled to concur in the judgment here.  But I do so under protest.  I would grant Argueta-Rosales his wish and allow him to go to jail.